KUNKLER ET AL., APPELLEES, *v.* GOODYEAR TIRE & RUBBER COMPANY, APPELLANT.

[Cite as Kunkler *v.* Goodyear Tire & Rubber Co. (1988), 36 Ohio St. 3d 135.]

(No. 87-425—Decided April 13, 1988.)

*Hinton & Landi, James R. Hinton* and *Dean Konstand,* for appellees.

*Roetzel & Andress, Timothy J. Ochsenhirt* and *Jeffrey J. Casto,* for appellant.

H. BROWN, J. Before deciding whether summary judgment was proper, we must determine whether the provisions of R.C. 4121.80 apply to the case at bar and, if so, whether the statute can operate retroactively without violating the Ohio Constitution.

I

R.C. 4121.80 was enacted to govern actions alleging intentional torts committed by employers against their employees. Such intentionally tortious conduct is not protected by the immunity from civil liability granted to employers by the Ohio Constitution and the Ohio Revised Code.[1] *Blanken-*

---

[1] Section 35, Article II of the Ohio Constitution is the basis for legislative enactments in the workers' compensation area and in part provides:

"*For the purpose of providing compensation to workmen* and their dependents, *for death, injuries or occupational disease, occasioned in the course of such workmen's employment,* laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining the terms and conditions upon which payment shall be made therefrom. Such compensation shall be in lieu of all other rights to compensation, or damages, for such death, injuries, or occupational disease, *and any employer who pays the premium or compensation provided by law, passed in accordance herewith, shall not be liable to respond in damages at common law or by statute for such death, injuries or occupational disease. * * *"* (Emphasis added.)

R.C. 4123.74 implements this constitutional dictate and provides in part:

"* * * [E]mployers who comply with section 4123.35 of the Revised Code shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or *arising out of his employment* * * *."* (Emphasis added.)

*ship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572, syllabus.

In deciding whether the legislature intended the provisions of the intentional tort claims statute (R.C. 4121.80) to govern the cause before us, we turn to the language of the statute.

Subsection (H) states:

"This section applies to and governs any action based upon a claim that an employer committed an intentional tort against an employee *pending in any court on the effective date of this section* and all claims or actions filed on or after the effective date, notwithstanding any provisions of any prior statute or rule of law in this state." (Emphasis added.)

Appellant Goodyear argues that the case herein was "pending in any court" on August 22, 1986 (the effective date of R.C. 4121.80) because it was pending in the court of appeals from February 13, 1986 until January 7, 1987. We agree.

The phrase "pending in any court" is not defined in the statute nor elsewhere in the Workers' Compensation Act. In the absence of clear legislative intent to the contrary, words and phrases in a statute shall be read in context and construed according to their plain, ordinary meaning. *Youngstown Club* v. *Porterfield* (1970), 21 Ohio St. 2d 83, 50 O.O. 2d 198, 255 N.E. 2d 262.

We concluded in *State, ex rel. Cleveland Ry. Co.,* v. *Atkinson* (1941), 138 Ohio St. 157, 20 O.O. 162, 34 N.E. 2d 233, that a "pending" proceeding includes a subsequent appeal. We adhere to the reasoning by which we reached that conclusion.

Accordingly, we hold that when an appeal has been commenced in the court of appeals but the court has not yet disposed of the case on its merits,

the case is pending for the purpose of applying R.C. 4121.80.

## II

Since the case was pending in the court of appeals on August 22, 1986 (the effective date of R.C. 4121.80), we must next decide whether the legislature can, without violating the Ohio Constitution, make the definition of intentional tort retroactive to actions which accrued prior to August 22, 1986.

Because R.C. 4121.80(H) expressly makes the statute retroactive, the statute must be scrutinized in light of Section 28, Article II of the Ohio Constitution, which provides in part: "The general assembly shall have no power to pass retroactive laws * * *."

This constitutional bar has been frequently interpreted by the courts in this state. It has been established that the proscription against retroactivity applies to laws affecting substantive rights but not to the procedural or remedial aspects of such laws. *French* v. *Dwiggins* (1984), 9 Ohio St. 3d 32, 9 OBR 123, 458 N.E. 2d 827; *Kilbreath* v. *Rudy* (1968), 16 Ohio St. 2d 70, 45 O.O. 2d 370, 242 N.E. 2d 658; *State, ex rel. Slaughter,* v. *Indus. Comm.* (1937), 132 Ohio St. 537, 542, 8 O.O. 531, 534, 9 N.E. 2d 505, 508. In making the distinction between substantive and remedial, we are guided by *State, ex rel. Holdridge,* v. *Indus. Comm.* (1967), 11 Ohio St. 2d 175, 178, 40 O.O. 2d 162, 164, 228 N.E. 2d 621, 623:

"* * * [S]ubstantive law is that which creates duties, rights, and obligations, while procedural or remedial law prescribes methods of enforcement of rights or obtaining redress."

Subsection (G)(1) of R.C. 4121.80 defines the elements of an intentional tort committed by an employer upon an employee. It provides in part:

"(1) 'Intentional tort' is an act committed with the intent to injure another or committed with the belief that the injury is substantially certain to occur.

"* * *

" 'Substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer injury, disease, condition, or death."

This is substantive law. It defines the cause of action. It purports to govern the rights and duties of the employee and the employer.

Appellant Goodyear implies in its reply brief that subsection (G)(1) of the new statute merely reiterates the common-law definition of an intentional tort expressed in *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046, and thus does not impair or restrict the common-law intentional tort cause of action. The argument is specious. If the statute works no change in the common-law definition of intentional tort, the exercise in determining whether the statute applies to this case would be pointless.

Since the new statute purports to create rights, duties and obligations, it is (to that extent) substantive law. *State, ex rel. Holdridge, supra*; *State, ex rel. Slaughter,* v. *Indus. Comm., supra.*

Therefore, we hold that R.C. 4121. 80(G)(1) does not apply to intentional tort causes of action arising prior to August 22, 1986, the effective date of the statute. Accordingly, whether summary judgment was proper in this case must be resolved under the law as it existed prior to the enactment of R.C. 4121.80. In view of this holding, we need not analyze the extent of the change to the definition of intentional tort (as between employees, and employers) that has been wrought by R.C. 4121.80(G)(1).

### III

In deciding whether the trial court correctly granted summary judgment to Goodyear, we must follow Civ. R. 56[2] and view the record in the light most favorable to the party opposing the motion. *Williams* v. *First United Church of Christ* (1974), 37 Ohio St. 2d 150, 66 O.O. 2d 311, 309 N.E. 2d 924. Further, the inferences to be drawn from the underlying facts contained in depositions, affidavits, and exhibits must be construed in the opposing party's favor. When so construed, the motion must be overruled if reasonable minds could find for the party opposing the motion. *Hounshell* v. *American States Ins. Co.* (1981), 67 Ohio St. 2d 427, 433, 21 O.O. 3d 267, 271, 424 N.E. 2d 311, 315.

The standard for establishing an intentional tort in an employment situation has been addressed in *Jones, supra,* and *Blankenship, supra.* In the aftermath of those decisions, we see that some confusion remains, within the bench and bar. This confusion manifests itself in a failure to distinguish intentionality from recklessness and negligence, and from find-

---

[2] Civ. R. 56(C), in pertinent part, provides:

"* * * Summary judgment shall be rendered forthwith if the pleading, depositions, * * * affidavits * * * timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

ing intentional tort in facts which show only recklessness.

To establish an intentional tort there must be proof beyond that required to prove negligence and beyond that to prove recklessness. It is in this context that the facts should be examined to determine whether an employer has acted despite a known threat that harm to an employee is substantially certain to occur. Comment *b* to Section 8A of 1 Restatement of the Law 2d, Torts (1965) 15, expresses the differences among negligence, recklessness and intentional tort and addresses the precise point at issue when it states:

"* * * If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence, as defined in § 282. All three have their important place in the law of torts, but the liability attached to them will differ." See, also, Prosser & Keeton, Law of Torts (5 Ed. 1984) 35, Section 8.

Of course, the standard emerges not so much from the words used to formulate the test as it does from the decisions rendered in response to specific fact situations. Such is the nature of the common law.[3]

The question before us in this case becomes: Weighing the evidence and inferences favorable to appellees, was there reliable, probative evidence to show that Goodyear intentionally proceeded despite a known threat of harm to others which was substantially certain to occur?

The appellees submitted the affidavit of George Tucker. Tucker, an employee of Goodyear, swore that on three occasions prior to the one at issue here (the most recent being the day before appellees were injured) he had experienced an explosion inside Banbury No. 4 while mixing Stock No. 33377. The stock number, as used by Goodyear, is a short-hand specification of the ingredients to be mixed and of the manner in which the mixture is to be conducted. Tucker swore that on each of these occasions he reported the explosion to the supervisor, James Strayhand, who told Tucker: "run the thing anyway." The appellees proceeded to again mix Stock No. 33377 in Banbury No. 4, at which time the explosion which injured the appellees occurred. Since the same stock number was used, the inference could be drawn that Goodyear directed the mixture of

---

[3] The definition of intentional tort contained in R.C. 4121.80(G)(1) appears to focus on the consequence of an act rather than upon the act itself. The statute states:

" 'Substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer injury, disease, condition, or death."

This standard may be close to that pronounced in 1 Restatement of the Law 2d, Torts (1965) 15, Section 8A, which states:

"The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."

The definition of intentional tort in R.C. 4121.80(G)(1) is not necessarily antagonistic to, or different from, the standard set by the Restatement. However, the need to apply R.C. 4121.80(G)(1) to a specific set of facts is not before us.

ingredients known to have caused three previous explosions and which would, with substantial certainty, result in employee injury.

In his deposition, Strayhand denies Tucker's assertions. Strayhand specifically states that he never told anyone to go ahead in spite of complaints. Additional evidence can be marshaled in favor of appellant.[4] However, we are not finders of fact. We are not permitted to indulge in a weighing of the substantial evidence submitted on behalf of appellant. To do so would violate deeply ingrained standards of appellate review because this case comes to us from a ruling on summary judgment.

The evidence submitted by the parties is contradictory and we find that a genuine issue of material fact exists. Using the test announced in *Blankenship, supra,* and the Restatement, *supra,* reasonable minds could differ on the question of whether Goodyear's conduct was intentional. "Where the facts alleged are such that reasonable minds could differ as to whether the defendant's conduct was intentional, a jury question is created which ordinarily may not be resolved by summary judgment." *Jones, supra,* at 96, 15 OBR at 251, 472 N.E. 2d at 1052; *Cascone* v. *Herb Kay Co.* (1983), 6 Ohio St. 3d 155, 6 OBR 209, 451 N.E. 2d 815, paragraph two of the syllabus.

Based on the foregoing, we affirm the holding by the court of appeals that summary judgment was improper and remand the cause to the trial court for further proceedings in accordance with this opinion.

*Judgment affirmed.*

SWEENEY, DOUGLAS and WRIGHT, JJ., concur.

---

[4] See dissenting opinion herein.

MOYER C.J., HOLMES and LOCHER, JJ., dissent.

DOUGLAS, J., concurring. I concur in the judgment of the majority because it reaches the proper ultimate result. However, it continues to be my judgment, as expressed in my dissenting opinion in *Taylor* v. *Academy Iron & Metal Co.* (1988), 36 Ohio St. 3d 149, 522 N.E. 2d 464, that R.C. 4121.80 cannot apply in any respect to a relationship which is not employer-employee. If the theory of *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572, is accepted, as it must be to reach the majority's position herein, then, by necessity, the injury caused by the alleged intentional tort happened outside the "employment relationship," even though the injury did occur during the "course of employment."

With the foregoing reservation, I agree with the syllabus set forth in the majority opinion. I would go further, however, and decide an additional matter that was extensively discussed at the oral argument of this case. I think for the guidance of the bench and bar in like cases we should indicate that a case is only pending when it is in the trial court or is on appeal as of right. It is my judgment that a case is *not* pending even when a motion for certiorari, either to this court or the United States Supreme Court, has been filed. If the case, upon motion for review, is accepted by either this court or the United States Supreme Court, then that case would once again be pending.

Subject to the discussion in my dissenting opinion in *Taylor, supra,* and the foregoing (to the effect that R.C. 4121.80 does not apply in any respect to intentional tort actions filed by an injured person who suffered the injury during the course of employment because the language used in

*each* section of R.C. 4121.80 is "employer-employee" language), I agree that R.C. 4121.80(G)(1) may not be retroactively applied. I would go further, however, than the majority opinion and decide whether *any* part of R.C. 4121.80 is applicable to cases arising prior to August 22, 1986. The bench and bar throughout this state are anxiously awaiting a pronouncement from this court on all the issues raised by R.C. 4121.80 including, but not limited to, the constitutionality of the entire statute, the questions of the statute of limitations and statute of repose in section (A), the question of whether a jury trial may be or is negated by section (D), the cap on damages question in section (D), attorney fees provisions in section (F) and the question of whether the Industrial Commission can even be properly given the authority accorded to it by the legislature pursuant to this enactment. Our decision today will not give the needed answers to these questions. Trial judges and attorneys will still be left with the question whether cases should be tried under the "new law" or the "old law." The argument can be made that all these issues are not before us in this case. I think they are on the basis that the question of the retroactivity of R.C. 4121.80 has been raised.

I recognize that over the course of the years there has been a distinction made between retroactivity as it applies to laws affecting "substantive" rights and those which concern only "procedural or remedial" aspects of particular litigation. Section 28, Article II of the Ohio Constitution seems, on its face, to be clear that the General Assembly has no power to pass retroactive laws. I fear that our decision today might add to the confusion of that ever-shifting line between what is substantive and what is procedural. I would simply hold that R.C. 4121.80 by its terms makes the law retroactive and is in contravention of Section 28, Article II of the Ohio Constitution.

Finally, I comment on the incisive discussion by Justice Brown concerning Comment *b* to Section 8A of 1 Restatement of the Law 2d, Torts (1965) 15. I think Justice Brown has, in his intellectual discourse, struck upon the proper balance to be applied and the test to be used in determining what is an intentional tort. It should be noted that the discussion in the majority opinion concerning the Restatement does not involve workers' compensation laws or injuries occurring as a result of employment. As we come closer to resolving these often-litigated, highly emotional and ever-controversial areas, I once again reiterate that it is my judgment that since an alleged intentional tort occurs *outside the employment relationship,* neither R.C. Chapter 4123 nor 4121.80 can apply because by their own terms they deal with employer-employee relationships. Parties to an action alleging an *intentional tort* occurring during the course of employment are, for purposes of the intentional tort action, no longer employer and employee but are, instead, alleged intentional tortfeasor and victim. An allegation of an intentional tort, which occurs during the course of employment, should be treated as any other intentional tort and should be litigated by the same rules as we use to determine other such actions. Such consideration could include, for the determination of intent, the comment from the Restatement so well-analyzed and explained by Justice Brown.

Accordingly, I concur.

WRIGHT, J., concurring. I have concurred in the majority result due to my understanding of the mandates of Civ. R. 56. as fully set forth by Justice Brown.

The key to this case is what, if any, knowledge did Goodyear's agent have as to the lethal propensities of the batch labeled Stock No. 33377, being mixed by Kunkler and Carr on the day of their injuries. The Tucker affidavit indicates a batch of the same materials exploded on the day before appellees' injuries occurred, Tucker had warned supervisor Strayhand of this fact, and Strayhand decided to press forward despite this admonition. In appellees' view, this demonstration is more than mere recklessness on the part of appellant; rather it demonstrates intent to cause injuries that were substantially certain to occur.

As my brethren in dissent so aptly point out, a massive amount of evidence belies the Tucker affidavit. For example, while the exact content — the recipe, if you will — of the batch Tucker allegedly was processing is not in the record, it is undisputed that one of the two batches to be mixed on the day of appellees' injuries did *not* contain Dicup. Extensive and undisputed testimony indicates that Dicup was in the batch being processed by appellees. Further, it is without dispute that the Dicup proximately caused the fire that injured appellees and may well have contributed to the attendant explosion. Further, there is the devastating testimony by appellees' own expert who agreed that Goodyear would be "out of * * * [its] mind" to purposely include Dicup in any sort of batch that would be subjected to the temperature levels involved in this case. There is more — much more — as pointed out by my re-spected brethren in dissent. See in particular the testimony of Carr. Analyzing the whole of the record leads to the inexorable conclusion that, at least on the *present* state of the record, no reasonable jury could reach any conclusion other than that appellees' injuries were proximately caused by the accidental and nonintentional inclusion of Dicup in the particular batch which they were processing. However, such a conclusion obviously involves a weighing of the evidence. My understanding of the tests involved in a Civ. R. 56 proceeding precludes such an approach. Perhaps a heightened scrutiny test should be adopted in this type of case, but that is for another day.[5] In the interim, I must concur in the result achieved by Justice Brown.

HOLMES, J., dissenting. The position adopted by the majority does not seem tenable in the context of the affidavits and depositions presented in this Civ. R. 56 summary judgment case. Moreover, there is little doubt that the majority has mistakenly analyzed the materials here presented. Under no rational legal theory have appellees demonstrated a genuine issue as to the existence of an intentional tort. Therefore, I respectfully dissent.

The ultimate question presented is whether appellees have sufficiently demonstrated that appellant intentionally caused an explosion to occur or knew to a substantial certainty that such explosion would occur and injure appellees. Upon this point, there are several factual matters which are en-

---

[5] I am painfully aware of the high cost of prosecuting and defending these kinds of cases. Likewise, I am aware that there are many cases pending in the trial courts which were filed as a result of a misreading of this court's incomplete and misapplied decision in *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046. It is my hope that the bench and bar will carefully scrutinize these pending actions in light of the decisional law promulgated in *Van Fossen* v. *Babcock & Wilcox Co.* and the other cases decided today.

tirely misstated and are thus unsupportable.

Appellees asserted at the motion for summary judgment that: "Dicumyl peroxide ['Dicup'] is the chemical that was in the material that exploded, and caught fire * * *." Upon appeal, appellees, along with the majority *supra,* concluded that the injuries were the "result of an explosion * * * [the cause of which] was the combination of dicumyl peroxide and carbon disulfide in the batch of ingredients being mixed and heated in a machine known as Banbury No. 4." Initially, it must be pointed out that appellees failed to produce *any* evidence to substantiate their theory of the explosion. In fact, their very contentions are *refuted* by their own expert, who provided the only evidence upon this issue.

It was the expert's view that the presence of Dicup alone would, at most, result in a rapid temperature increase, referred to as a thermal decomposition, and a possible fire, but *not an explosion.* Deposition of John C. McCool, at page 44, line 5; page 45, lines 9 through 12; page 46, lines 14 through 18; page 48, lines 13 through 15; page 79; page 88, lines 19 through 21. Furthermore, he expressly rejected any suggestion that he give an opinion which asserted that Dicup possessed volatility, restricting his analysis to its thermal decomposition properties. *Id.* at page 93. Finally, by his affidavit, sworn to and subscribed upon the very date of trial, he thoroughly retreated from the conclusion advanced by ap-

pellees and adopted in the majority opinion. He instead averred that: "[D]icumyl peroxide present in the material being mixed *at the time of the explosion and fire* is recognized and known among compounders in the rubber industry as being substantially certain to decompose and, *in a mixture with other combustible materials, to result in a fire * * *."* (Emphasis added.)

Regarding the additional accelerant, carbon disulfide, the expert opined as follows:

"Q. But is it not also your opinion that irrespective of whether the carbon disulphide [*sic*] was in there, that the Dicup in and of itself would have resulted in a fire and explosion?

"A. Certainly a fire, yes.

"Q. Would the carbon disulphide [*sic*], assuming there were sufficient quantities, be more predictive of a fire or explosion or both?

"A. I can only guess that it would increase the likelihood *of a fire.*

"Q. *And the carbon disulphide* [*sic*] *would have no relationship to there being an explosion?*

"A. In the amounts that would be present, that's right. I would not expect to have a considerable quantity of carbon disulphide [*sic*] in that Banbury."[6] (Emphasis added.) *Id.* at page 46, line 14 through page 47, line 3.

Since it was the explosion which principally created the injuries at issue, appellees were required at the least to present an explanation of its cause. By failing to produce a credible

---

[6] In the expert's sole foray into an expression of potential causes of the explosion at issue, he asserted that when appellee Kunkler opened the ram lid (to add oil) there may have occurred a sudden outrush of unmixed, extremely fine, black soot additives which may have created the conditions for an explosion. *Id.* at pages 39-42.

This material is, of course, a common component to any number of rubber compounds, see, *e.g.,* deposition of Carr, at page 25, and mixes quite slowly with the rubber compound. However, the expert refused to give an opinion that the dust did rise to the top of the mix or did actually cause the explosion. Deposition of McCool, at page 44.

explanation — appellees' expert refuting the explanation offered — appellees have omitted a necessary precondition for demonstrating intent. They have failed to specify an act of appellant, intentional or otherwise, which brought about the explosion and appellees' injuries.

Also, the power of the affidavit of witness George Tucker to create an issue of fact is entirely misrepresented.[7] This affidavit, sworn to and subscribed the day of trial, asserted that while running batches of No. 33377, the affiant had observed three explosions "of the material inside the Banbury," and had reported each of these to supervisor Strayhand, who he avers told him to "run the thing anyway." This is asserted to imply that appellant had knowledge of the propensity of the material compounded to explode, that these explosions were of the same kind as that which injured appellees and, therefore, that appellant knew, to a substantial certainty, that appellees would be injured. That supervisor Strayhand directly contravenes such statements is said to merely create an issue to be resolved by the trier of fact.[8] As shall be observed, the uncontroverted facts in · the other materials before the court rendered Tucker's statements ludicrous and, at best, irrelevant.

Initially, it should be pointed out that there was no reference to any physical evidence that such other explosions occurred in any deposition or affidavit submitted to the court. On the face of Tucker's affidavit, it is clear that he could not have intended the term "explosion" to include an explosion of the magnitude of the one at issue. After all, he mentioned no harm to himself or others, or any physical damage to the Banbury or the surrounding materials. In fact, it is directly inferable from the face of the affidavit, even in a light most favorable to appellees, that no such damage or injuries were present. Tucker avers that *he* reported the incidents, which indicates that there were no hindering injuries or general pandemonium comparable to that which resulted from the explosion at issue. That the supervisor ordered Tucker to continue the production indicates that the supervisor observed no evidence of an "explosion" which would require that the Banbury be shut down. In light of the physical processes alone, which would require a cleanup of an exploded batch in order to avoid polluting subsequent batches, it is untenable to suggest that the alleged "explosions" of the material inside the Banbury were of sufficient magnitude as to warrant notice of a dangerous compound to the employer. See, *e.g.,* deposition of James Sesic, at page 13 (debris around

---

[7] The affidavit states, in its entirety, as follows:

"GEORGE TUCKER, being first duly sworn according to law deposes and says that he is aware of the fire and explosion which occurred on March 25, 1982, while Plaintiffs were operating Banbury No. 4; that on three occasions prior thereto, one as late as the day before the fire and explosion, Affiant while mixing stock no. 33377 in Banbury No. 4 had experienced an explosion of the material inside the Banbury, and that on each of these occasions he reported the explosion to Defendant's supervisor, JAMES STRAYHAND, who told Affiant to 'run the thing anyway.' "

[8] Strayhand, in his deposition, at page 38, stated that whenever he was told of a problem with any of the Banburys, his practice was to shut them down. This was corroborated by appellee Kunkler, who stated that the practice of the supervisors on being informed of a malfunction in a Banbury was to either fix it or let it stand idle until fixed. Kunkler deposition, at page 53.

the Banbury); page 22 (residue inside the Banbury); plaintiffs' exhibit 4/Sesic (property damage report); plaintiffs' exhibit 3/Sesic (personal injury report); plaintiffs' exhibit 5/Sesic (security police irregularities report).

The fact that three such "explosions" occurred without any demonstrable harm to Tucker, the machine, or the surrounding materials, at the very least indicates that nothing remotely approaching the kind of explosion at issue ever occurred in Tucker's presence. Therefore, his affidavit cannot be taken as a basis for inferring that explosions of this kind had ever occurred before or, inferably, that the company had knowledge that Stock No. 33377 possessed a propensity for dangerous explosions.[9]

Also, the deposition testimony of Kunkler and Carr, both of whom had been working in the area over an extended period of years, asserted that while they had heard of occasional fires, they had never observed or even heard of an explosion occurring in a Banbury. Carr testified as follows:

"Q.  Had there been fires in the Banbury before?

"A.  Not since I have been working on it.

"Q.  Were there ever fires in the Banburys in the ten years you were the utility man?

"A.  I hadn't seen any.

"Q.  So to your knowledge, at least for the previous ten years, there had been no fires in any of the five Banburys?

"A.  I can't recall any.

"Q.  Had there been any explo-

sions in any of the five Banburys during the ten and a half years you were around there?

"A.  No.

"Q.  * * * At least for ten years before that you never heard of that happening before?

"A.  I haven't, no.

"Q.  Do you know whether somebody else had?

"A.  Not that I know of." Deposition of Carr, at pages 21-22. See, also, the deposition fo Kunkler, at page 40, lines 16 through 25.

The deposition of Kunkler is in agreement on this point, except only that he had heard of an occasional fire occurring in a Banbury, usually as a result of a faulty thermocouple (thermometer). Such observations of the parties *supplement* those inferences derived from the deposition of Tucker, *i.e.*, that no harmful explosions had actually occurred prior to the one at issue.

Furthermore, the remaining facts and testimony easily demonstrate, without contradiction, that the explosion was accidental. As noticed by appellees' own expert, described by Kunkler and Carr, and generally established as a factual occurrence, appellees had only just completed the successful processing of material bearing the same batch designation, *i.e.*, No. 33377, as that which was in Banbury No. 4 when the explosion occurred. Appellees have asserted, and it seems reasonable to accept as true, that "[t]hrough its exacting and scrupulous control," appellant insured that every batch of compounds conformed to "the

---

[9] Goodyear's lack of knowledge was evidenced in part by a report dated the day of the explosion, prepared by a Goodyear security officer. Pl. Ex. 6. It stated, in part: "No one I spoke to could come up with a positive explanation why it happened for

sure. * * * I learned that fires have occurred during this mixing process before — although I was told they are not that common—but nothing of the dimension and intensity which occurred in this incident."

formula for the chemicals to be used [which] was placed on a written card bearing a number identifying the particular stock."

It can only be concluded that since both batches bore the number 33377, they were identically prepared, or at least intended to be identically prepared. The first batch was processed without incident and was forwarded to the mill floor for completion of the process.[10] The unavoidable inference is that whatever caused the explosion, whether related to a reaction with Dicup or not, was not present in the first batch. This would appear to create a strong factual basis for the view that the explosion did not result from a calculated formula, but from an *accidental* combination of factors.

Also, appellees' expert testified repeatedly in his deposition that the materials erroneously asserted by appellees to be explosive could only have been added *accidentally* to the compounds. Deposition of McCool, at page 33; page 50; page 58; page 69. He further testified that the Banbury is a safe piece of equipment and that the mixing process is not a dangerous process. *Id.* at pages 60-63. In order to better explain his views, the process engaged in by the parties must be briefly set forth.

Appellees were engaged in creation of a "non-production run" which means simply that the rubber compound created was not to be a finished product but was to be moved down onto the mill room floor where the process could be completed. More particularly, the purpose of the non-production run was to combine the various rubber compounds with the added filler materials which imbue various qualities. The final process is initiated by adding other compounds which cause a controlled "thermal decomposition" and ultimately vulcanization of the material into the desired quality and form, in this case racing tires. It is imperative that, in the non-production stage, the material must be evenly heated for a relatively long period of time to ensure that all the materials evenly mix. *Id.* at pages 37-38.

The materials added at the production stage for vulcanization and which induce thermal decomposition are various oxides and sulphurs. Apparently, dicumyl peroxide and carbon disulfide are examples of such vulcanizing agents. See *id.* at pages 37-38; cf. page 42. (It is so described on page 76, lines 19 through 20.) In fact, McCool (and one of Goodyear's analytical chemists investigating the explosion) stated that normal non-production batches do not "have any ingredients in it that I can visualize causing a problem," McCool deposition, at page 47, and that one would not expect carbon disulfide to be present therein. Deposition of Siddharth Patel, at page 26; plaintiffs' exhibit 7. It is for this reason that McCool agreed that one would "literally have to be out of * * * [his] mind to want to put those [vulcanizing agents] into a non-productive [*sic*] batch * * *," and that "Goodyear * * * would not want those in a non-productive [*sic*] batch * * *." *Id.* at page 38.

Clearly, this expert, a former employee of B. F. Goodrich, reasonably concluded that the manufacturer would not intentionally or even knowingly include the vulcanizing agents in

---

[10] An analytical analysis of the Stock No. 33377 batch which was being processed just prior to the explosion disclosed no evidence of any accelerant or dicumyl peroxide in the finished stock. Only the expected hydrocarbons were present. Pl. Ex. 7. Sesic, the Goodyear employee who conducted the analysis, confirmed this conclusion in his deposition. Sesic deposition, at page 27.

a non-production run because to do so would ruin the compound by premature vulcanization. This conclusion is further supported by the list of ingredients for Stock No. 33377 furnished to appellees approximately nine months prior to the hearing and which the expert had while formulating his opinions. No vulcanizing agents were included in this list.

Having considered the factual misreadings inherent within the majority opinion, particularly that involving reliance upon Tucker's affidavit, it remains to explain how the majority opinion, while correctly quoting the applicable law, failed to properly apply it. In the companion case of *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, we stated that in order to prove an intentional tort under *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046, the employer must have had, *inter alia,* "(1) *knowledge* * * * of the existence of a *dangerous* process, procedure, instrumentality or condition within its business operation; [and] (2) knowledge * * * that if the employee is subjected by his employment to such * * * condition, then *harm* to the employee will be a *substantial certainty* and not just a high risk * * *." (Emphasis added.) *Id.* at paragraph five of the syllabus.

We are aware that when considering a motion for summary judgment, the inferences to be drawn from the underlying facts contained in the record, and indeed the record itself, must be viewed in a light most favorable to the party opposing the motion. See *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267. "It is axiomatic that a motion for summary judgment shall only be granted when there is no *genuine* issue as to any material fact and the moving party is entitled to judgment as a matter of law." (Emphasis added.) *Wills* v. *Frank Hoover Supply* (1986), 26 Ohio St. 3d 186, 188, 26 OBR 160, 161, 497 N.E. 2d 1118, 1120; see, also, *Smiddy* v. *The Wedding Party, Inc.* (1987), 30 Ohio St. 3d 35, 30 OBR 78, 506 N.E. 2d 212. We are also aware that the evidence on summary judgment may not be weighed by the court, but neither may it be ignored. "[I]f the defendants on the motion succeeded in proving that the plaintiff would not have enough evidence to go to the jury on the issue, the [summary] judgment was right." *Dyer* v. *MacDougall* (C.A. 2, 1952), 201 F. 2d 265, 268 (opinion per L. Hand, J.). A thorough review of the pleadings, affidavits, depositions and other evidence in the record *sub judice,* even in the light most favorable to appellees, discloses that they failed, solely by the Tucker affidavit, to set forth specific facts pointing to a genuine issue of whether Goodyear committed an intentional tort against them.

The most that can be derived from the affidavit at issue is that the employer had been made aware that some batches of No. 33377 were creating non-harmful, non-damaging "explosion[s]." These may have varied in intensity from a loud exhalation of air to a noise level associated with a firecracker, but the affidavit does not so specify. Instead, as was pointed out previously, the very fact that Tucker, and only Tucker, reported these alleged "explosion[s]" demonstrates that he was not harmed by them, and that no one else took any notice of them. It was demonstrable, as a near certainty, from all of appellees' own witnesses that no *dangerous* explosion of any kind had occurred during the prior processing of Stock No. 33377. It was further established by appellees' own expert that the company would

not have wanted to include *any* of the chemicals mistakenly alleged to have exploded in the compounds because they are only utilized during the final vulcanizing process.

We therefore are confronted with a situation where none of the alleged prior events would have informed the employer that processing batches of No. 33377 was dangerous to employees for whatever reason, and where the employer would have every economic incentive not to include the chemicals mistakenly assumed to have caused the explosion. There is no rational view which, under these circumstances, would charge the employer with "knowledge * * * of the existence of a dangerous process * * * or condition."

Also, we made it clear in *Van Fossen* that the employer must know to a "substantial certainty" that harm will result to the employee subjected to the dangerous condition. Relying upon Prosser, as the majority also does here, we therein observed that "the mere knowledge and appreciation of a risk" falls short of the "substantial certainty" standard. *Id.* at paragraph six of the syllabus. Accordingly, the analysis appears to require that two issues be considered: (1) what degree of threat of harm existed, and (2) what was the knowledge and appreciation of that threat of harm.

As previously mentioned, the harm threatened could not have been more than that experienced by affiant Tucker, who apparently was not injured at all. Accordingly, there was no *threat of harm*, but at best an incalculably small risk of harm. Such a small risk of harm would ordinarily not even support a claim for negligence under the facts of this case. It could, therefore, hardly support a claim that the employer knew "to a substantial certainty" that harm *would result*. In fact, there was not even such a threat as would ordinarily cause one to be alarmed. Consequently, the facts of this case fall far short of the standards established in *Van Fossen,* derived as they are from the Restatement of Torts 2d, and Prosser & Keeton on Torts.

In conclusion, the very best example of the faulty logic underpinning appellees' intentional tort claims is exemplified by the deposition testimony of Kunkler. He was convinced that because the explosion occurred, *someone* was at fault. However, he, like the majority here, cannot point to a single individual who, or instance of conduct which, would indicate the presence of an *intent* as we have defined it in *Van Fossen.* He stated as follows:

"Q. Prior to the date of your accident, did you consider your job a job where you were risking your personal well-being?

"A. No, sir.

"Q. Did you ever express to any of your superiors that you thought you were being asked to do a risky task or a risky job?

"A. No, sir.

"Q. Prior to the date of your accident, did you think, in your position as a Banbury operator, that there was a risk of your being injured?

"A. No, sir.

"* * *

"Q. Do you believe that employees of Goodyear failed to properly maintain Banbury No. 4?

"A. Yes, sir.

"Q. In what way?

"A. Something malfunctioned and they weren't aware of it, sir.

"* * *

"Q. Other than the fact that this fire and explosion occurred, is there any other fact that you have that supports your belief that this machine was not properly maintained?

"A. The hardest thing in the

world to get done at Goodyear is to get something fixed, sir.

"Q. Irrespective of your opinion, which is a broad statement, I asked a little narrower question. On this occasion, with Banbury No. 4, other than the fact that there was a fire, what else leads you to the conclusion that Banbury No. 4 was not properly maintained?

"A. Just the fact that most of the time, when you ask to get something fixed, it may take two or three months to get it fixed, sir.

"Q. Was there something on Banbury [No.] 4 that needed [to be] fixed?

"A. Not to my knowledge, sir." Deposition of Kunkler, at pages 48, 54 and 55-56.

For all the foregoing reasons, I hereby dissent.

MOYER, C.J., and LOCHER, J., concur in the foregoing dissenting opinion.