DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is from the March 21, 2002 judgment of the Ottawa County Court of Common Pleas which granted summary judgment to appellee, Scandura Ohio, Inc., and dismissed the intentional tort claim of appellant, Virginia Adcock. Because we find that summary judgment should not have been granted to Scandura, we reverse the decision of the lower court. Appellant asserts the following assignments of error on appeal:
 {¶ 2} "Assignment of Error No. 1: In an employment intentional tort case where an injured employee presents evidence by way of affidavit and/or deposition testimony on all three prongs of the standard established in Fyffe v. Jeno's, Inc., an order of the Common Pleas Court granting summary judgment to the defendant employer is in error and must be reversed.
 {¶ 3} "Assignment of Error No. 2: Summary judgment is not proper in an employment intentional tort case when expert opinion evidence is presented on all three prongs of the Fyffe test, and an order granting summary judgment to defendant employer is reversible error and must be vacated."
 {¶ 4} Because both assignments of error concern the issue of whether summary judgment should have been granted to Scandura, we will consider them together. On review of a summary judgment motion, our role is to review the record based upon the same standards as the trial court. Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35, 36. Thus, we must determine if the requirements of Civ.R. 56(C) have been met. That rule provides that summary judgment is appropriate if:
 {¶ 5} "* * * there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
 {¶ 6} * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *"
 {¶ 7} The undisputed evidence in this case is that Scandura manufactures fabric with rubber heat-pressed into the fabric by a calendar machine. Appellant began working for the company in September 1997. At first, she was trained on all of the machinery in the plant by other employees and received certification to operate particular machines from her supervisor and trainer. There were no written operating instructions. Appellant was trained for approximately two weeks on the calendar machine and certified to work on that machine.
 {¶ 8} The plant utilized three different calendar machines. Appellant worked for the company about a year working in various positions, including operator on Calendar Two. She then bid on a job working on a calendar machine. She first worked on Calendar Three for a few nights, then Calendar One for a few months, and finally on Calendar Two. She had been working on Calendar Two for six weeks before the accident occurred on April 21, 1999.
 {¶ 9} The Farrel-Ansonia Calendar on which appellant was injured was built in 1920. The machine normally runs at about 80 feet per minute. It has adjustable pressure rollers to control the amount of rubber that is being applied. The machine has three large horizontal steel rolls and a smaller canvas roller at the bottom. When the machine is running, the lower roller would be heated to 120 degrees up to 200 degrees. The rollers are heated and cooled by water. The rollers take about half an hour to cool. Weighted rollers were sometimes used to control the pressure on the rubber and fabric.
 {¶ 10} The operator of the calendar controls the thickness of the rubber and sets the machine to cut off the excess rubber, fix repairs, etc. The mill man feeds rubber sheets onto the mills to make it pliable and workable and then sends it to the calendar where it is fed into the calendar between the middle and top rolls. The fabric is fed into the calendar from the front of the machine between the middle and bottom rolls. The calendar helper assists the operator by feeding the rubber into the calendar from the back side of the machine and controlling the width of the rubber. The helper controls the speed of the machine. The helper also monitors the machine to ensure that the excess rubber strips, or collar, cut off by the operator is being fed back into the calendar to be reused. Appellant and Rick Mullins, another employee who trained her, testified at their depositions that in order to make the collar feed back into the machine, you had to grab it with your hand and push it back into the machine. If the collar broke, the helper was trained to slow the machine down, grab the collar and feed it back into the machine. Mullins testified that 39 feet a minute was a sufficiently slow speed to accomplish this task.
 {¶ 11} Because of the danger posed by the heated rollers and the heated rubber, gloves are furnished by Scandura. Robert St. Clair, the maintenance manager at Scandura for the prior thirteen years, testified that Scandura was aware that the fingertips of the gloves could get caught in the in-running nip points — places where you stick your hand or object between a roller and another roller or bar. William Cromer, Manager of Plant Engineering, also testified that he knew of someone who had gotten caught in the rollers when the company was owned by its predecessor. Rick Mullins, an employee of Scandura for approximately five years, testified that he believed that appellant's glove got caught because the gloves are too big for most women and even some men. Because of the danger posed by the in-running nip point of the machines, there were mill release drills every couple of months. The drill covered the type of situation where someone got caught in the mill or calendar rollers and the other employees had to get them out. Sometimes appellant participated in the drill and sometimes she just watched. Appellant had been through the drill three or four times.
 {¶ 12} Six months prior to the accident, the machine was modified to add pneumatic cylinders powered by compressed air to add pressure to the rollers. The machine had previously been factory-modified in 1966 or 1968 to add free weights which would add weight to the rollers. When the machine had the weights, employees could open the rollers by lifting the arms holding the weights. After the modification, the only way to get the pressure off the rollers was by disconnecting the cylinders. Employees could set the pressure of the pneumatic cylinders as they saw fit. However, appellant stated that she did not really get involved with the matter.
 {¶ 13} John Vascik, a supervisor, initiated the request to modify the pressure roller on Calendar Two because the same change had been made in another plant. This change would create a more even pressure on the rubber and fabric so that the rubber was imbedded more evenly into the fabric. Cromer conducted an informal investigation to determine whether the modification should be made. He stated that:
 {¶ 14} "[I]t looked like a fairly good idea to add additional pressure, which is what, what [sic] they wanted. The cost was minimal. It didn't take long to do it. That was pretty much the extent of the investigation. Certainly didn't see any reason not to do it at the time."
 {¶ 15} Cromer realized that there was a nip point on the calendar, and that the addition of the cylinders would make more pressure at the nip point. But he did not see any reason why they should not add the additional pressure. Prior to the modification, he did not believe that the nip point on the calendar was dangerous. He also stated that no engineering was done to ensure operator safety after the modifications. To his knowledge, appellant was the only serious injury on this machine.
 {¶ 16} Mullins testified that after the cylinders had been installed, there were a lot of objections to them because the rollers did not open up and the calendar helper could get caught. He personally told Vascik that it was unsafe. Mullins testified that there were times when the helper's glove would get caught in the nip-point but the helper could pull it out without getting hurt. Richard Biggert, another Scandura employee, also testified that he told Vascik that the installation of the cylinders was unsafe because initially the rollers did not open at all and were always under the highest pressure. Cromer, however, did not believe that an employee could be more seriously injured after the modification.
 {¶ 17} The machine was modified to add the air pressure regulator. An OSHA quick release valve in the airline was installed that would pop immediately and a siren was added. The function of the quick release valve was to immediately release the pressure on the rollers rather than gradually. However, the quick release valve was located on the opposite side of the machine, outside of appellant's reach when she was caught in the opposite side of the machine. Other safety measures were already in place: safety cables, a safety bar, and a safety floor mat to stop the machine.
 {¶ 18} Mullins testified that before the pneumatic cylinders were installed, employees who got caught could pull their hands out without getting hurt or without getting pulled in further. After appellant was hurt, other employees wanted the cylinders removed and they were removed. St. Clair also agreed that, based on his experience, the safest possible manner to run the machine was probably in the manner that existed prior to the modification. Vascik, St. Clair, and Cromer all testified that they did not know of any other serious injury similar to appellant's injury prior to or after the calendar machine was modified. Appellant testified that she had heard stories of one man who broke his arm because he got caught in the rollers and another who had a scar from being caught in the rollers.
 {¶ 19} St. Clair testified that prior to the modification to the machine and since its modification the only injury that has occurred on the calendar machine was an employee getting his glove caught in the pressure roller. Therefore, Scandura did drills on how to rescue someone caught in the machine and provided the necessary equipment and medical aids nearby. St. Clair testified that everyone anticipated that an employee would get caught in the rollers. Vascik also testified that he knew the danger posed by an unguarded in-running nip point.
 {¶ 20} The night of her accident, appellant was working with John Winnagle and Mullins. There were typically two operators on Calendar Two. John was the calendar operator and Rick was the mill man. That night they were skimming, or pressing the rubber into the fabric rather than laying it on the fabric. Appellant was the calendar helper. At one point, a collar broke and she was attempting to get the collar started feeding back into the calendar machine. Her glove got caught and pulled her into the pressure roller. Once she realized that she could not get her hand out, she stopped the machine. Her arm was caught up to the bicep. Mullins testified that he was there five seconds after appellant got hurt and sounded the siren. He turned the pressure down, but it didn't make any difference because the gap between the rollers wasn't wide enough to release the pressure off appellant's arm or pull her out of the machine. He believed that the cylinders were operating at 80 pounds pressure at the time of the accident. Based upon St. Clair's examination of the fabric in the machine after the accident and the location of appellant's glove, he determined that the machine ran for a short period before appellant stepped on the safety mat to stop the machine. Cromer did not know who recorded the fact that the machine was running at 39 feet per minute at the time of the accident, but testified that this speed does not necessarily indicate that appellant had slowed the machine down prior to feeding in the collar because he did not know the production speed at the time.
 {¶ 21} Because of the way the roller is assembled onto the machine, bolts had to be removed. It took 20 minutes to half an hour to get appellant out. Mullins believed that if the pneumatic cylinders had not been installed, the employees could have lifted the pressure roller weight arms and pulled appellant out in 10 to 15 seconds. St. Clair also testified that had appellant been caught in the machine prior to its modification it would have taken less time to get her out of it. Dr. Harnkess, a professional engineer, attested to the fact that without the modification, the pressure roll could be lifted manually. He also attested that the calendar machine could have been designed so that the rolls could be separated by power and appellant would have been able to get her arm out of the machine faster.
 {¶ 22} Safety training consisted of attending a meeting every few months to watch a safety video. However, there were no videos specifically designed to cover the calendar machines. Members of the safety committee met monthly to tour the plant, listen to the employee's comments, and check for safety violations. The committee has attended conferences and read literature on safety. They were not, however, formally trained in risk recognition and analysis.
 {¶ 23} There was some contradictory evidence regarding the distance between the rollers before and after the recent modifications to the calendar machine. St. Clair testified that the rollers opened three inches after the modifications as opposed to approximately three to four inches prior to the modification. Cromer agreed that the opening between the rollers was reduced by the addition of the pneumatic cylinders, but he did not know by how much. Biggert believed that the machine opened as wide after the modification as it did before the modification. However, Mullins testified that without the pneumatic cylinders, the rollers could be separated about six to eight inches. Afterward, he believed that the rollers could only be separated two and half inches.
 {¶ 24} Finally there was contradictory evidence regarding the in-running nip points. St. Clair testified that Scandura always trained people to keep their hands away from such areas. However, Mullins and appellant both testified that they were trained as the calendar helper to grab the collar of rubber with their hand and push it back into the machine.
 {¶ 25} The trial court found that it was undisputed that appellant attempted to feed the collar back into the roller without making an attempt to stop or slow the roller. The court also cited to St. Clair's testimony that none of the machines had been locked out due to safety issues and that he knew of no one who had reported that the modification to the machine made it unreasonably dangerous. He also testified that no one had been similarly injured on the a calendar machine. The court cited to Cromer's testimony that he did not believe that the calendar machine was dangerous. The court noted that appellant had no evidence that anyone in management knew that the calendar machine was dangerous or that anyone else had suffered a similar injury or come close to it. Therefore, the court concluded that there was no evidence that the calendar machine was a dangerous instrumentality, that Scandura had knowledge that the employees were using a dangerous instrumentality, or that Scandura directed appellant to use the calendar machine with substantial certainty that the injuries she suffered would occur. Appellant then sought an appeal to this court.
 {¶ 26} The law regarding employer intentional torts has been defined and clarified by the Ohio Supreme Court on several occasions. Under the workers' compensation system, employees gave up their right to bring common law tort actions for their injuries resulting from negligently-caused industrial accidents. Blankenship v. CincinnatiMilacron Chemicals, Inc. (1982), 69 Ohio St.2d 608, 614. However, the workers' compensation system was not designed to give employers "the right to carry on their enterprises without any regard to the life and limb of the participants in the endeavor and free from all common law liability." Id. at 614, fn. 11. Therefore, the Ohio Supreme Court held in the Blankenship case that the workers' compensation law does not preclude an employee's common law action for an intentional tort committed by his employer. Id. at the syllabus. However, in order to preserve the workers' compensation system, "the standards for maintaining an intentional tort action must be strictly construed" or this exception will interfere with the purposes of the Workers' Compensation Act." VanFossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 113-114. Therefore, the court defined an intentional tort as "* * * an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Jones v. VIP Dev.Co. (1984), 15 Ohio St.3d 90, paragraph one of the syllabus.
 {¶ 27} In a later attempt to clarify the tort, the Ohio Supreme Court identified the prima facie elements of the cause of action as being: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph five of the syllabus, modifying Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus.
A. Knowledge of the existence of a dangerous process.
 {¶ 28} When determining whether a machine is dangerous, we must determine whether it presented a danger which "falls outside the `natural hazards of employment,' which one assumes have been taken into consideration by employers when promulgating safety regulations and procedures." Brookover v. Flexmag Indus., Inc., 4th Dist. App. No. 00CA49, 2002-Ohio-2404, at ¶ 104. Furthermore, we must find that the employer had actual knowledge that the machine was dangerous not that the employer reasonably should have known that the machine was dangerous. Moebius v. General Motors Corp., 2nd Dist. No. 19147, 2002 Ohio 3918, at ¶ 28.
 {¶ 29} In this case, the trial court concluded that there was no evidence that the calendar machine was a dangerous instrumentality because there was no evidence that anyone had previously been injured on one and management employees testified that they did not believe that the machine was dangerous. We find that the trial court failed to consider all of the evidence presented by appellants.
 {¶ 30} The maintenance manager testified that gloves are furnished because of the danger posed by the heated rollers and rubber. He also testified that everyone was aware, before and after the calendar machine was modified, that the fingertips of the gloves could get caught in the in-running nip points. Therefore, they regularly conducted mill release drills so that employees could practice removing someone from the calendar rollers if they were caught. He and the plant engineer testified that the modifications to the calendar machine reduced the distance between the rollers. Another employee testified that prior to the modification, the rollers could be separated about six to eight inches when other employees lifted the weight arms upward to release someone caught in the machine. Because of the modification, appellant waited 20 to 30 minutes until bolts were removed to be extracted from the rollers.
 {¶ 31} While St. Clair testified that Scandura always trained people to keep their hands away from such areas, Mullins and appellant both testified that they were trained as the calendar helper to grab the collar of rubber with their hand and push it back into the machine while the machine was running.
 {¶ 32} This court has recently noted in Russell v. InterimPersonnel, Inc. (1999), 135 Ohio App.3d 301, 308 that it is self-evident that feeding material into an unguarded nip-point puts an employee in great danger of suffering a significant injury. We also held that this fact alone may be enough to send a case to a jury.
 {¶ 33} Mullins testified that he complained to Vascik that the modifications to the calendar machine made it unsafe because the rollers did not open up and the calendar helper could get caught. Biggert also testified that he complained to Vascik that the modifications would not permit the removal of the pressure on the rollers and that the rollers could no longer be opened up. In response to their complaints, an air pressure regulator was added as well as a quick release valve to immediately release the pressure on the rollers. However, this change did nothing to increase the width between the rollers or the ability to get someone out of the machine quickly.
 {¶ 34} We conclude that there was evidence that Scandura knew that the in-running nip points of the calendar machine were dangerous. That is why Scandura trained people to be careful and drilled employees on how to help another employee when they became caught in the machine. Furthermore, there was evidence presented that Scandura knew that the temperature of the rollers presented a danger and provided employees with protective gloves. Finally, there was contradictory evidence as to whether the gap between the rollers was reduced by the modification, and there was evidence that the ability to quickly extract someone from the machine was lost by the modification. There was also evidence that the employees complained to their supervisor about the danger they perceived. Therefore, we find that there was evidence presented which would support appellant's claim that Scandura knew that someone caught in the machine after the modification would suffer serious harm.
B. Substantial certainty that the employee would be harmed.
 {¶ 35} The Supreme Court of Ohio developed the meaning of intentional tort based on Restatement of the Law 2d, Torts, Prosser Keeton's definition of intent, and the constitutional and legislative history of Ohio's workers' compensation system. Van Fossen, paragraph five of the syllabus. The court held that an intentional tort falls somewhere between a "deliberate assault on an employee by an employer, but more than the grossly negligent or reckless act of an employer which occasions an injury to the employee." Id. at 114-115. It is only when a risk of injury is substantially certain to occur, that the law will impute the intent to injure the employee upon the employer.Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph six of the syllabus and Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100 at 117.
 {¶ 36} Since substantial certainty refers to more than negligent or reckless actions by the employer that harm the employee, there must be evidence of more than just knowledge and appreciation of the risk. Id. at 115. The risk must be more than "a foreseeable risk which a reasonable person would avoid," it must be a substantial certainty in the mind of the actor. Id. and Pariseau v. Wedge Products, Inc. (1988),36 Ohio St.3d 124, 126. Therefore, the employer's actions, the injury, and the circumstances under which the injury occurs must be considered to determine whether the injury was beyond the scope of what was intended to be covered under the Workers' Compensation Act. Id. at 116.
 {¶ 37} To establish an intentional tort of an employer, proof beyond that required to prove negligence and recklessness must be established. Kunkler v. Goodyear Tire Rubber Co. (1988),36 Ohio St.3d 135, 139. The Ohio Supreme Court has described this level as proof as follows: "Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Fyffe v. Jeno's, Inc.
(1991), 59 Ohio St.3d 115, paragraph one of the syllabus.
 {¶ 38} Substantial certainty is generally proven by circumstantial evidence and inferences drawn from the evidence. Youngbird v. WhirlpoolCorp. (1994), 99 Ohio App.3d 740, 746; Jones v. Bryan Canning Co. (Feb. 27, 1998), Williams App. No. WM-97-008; and
 {¶ 39} Shreve v. United Electric and Construction Co., 4th Dist. App. No. 01CA2626, 2002-Ohio-3761 at ¶ 43. Therefore, the determination of "substantial certainty" will depend largely upon the nature of the dangerous condition at issue. Gibson v. DrainageProducts, Inc. 95 Ohio St.3d 171, 2002-Ohio-2008, at ¶ 27 andKunkler v. Goodyear Tire Rubber Co. (1988), 36 Ohio St.3d 135,139.
 {¶ 40} While the absence of prior injuries is a factor to consider in determining whether the employer knew that the injuries were substantially certain to occur, it is not the sole factor to consider.Moebius v. General Motors Corp., 2nd Dist. No. 19147, 2002 Ohio 3918 at ¶ 38; Shreve v. United Electric and Construction Co., 4th Dist. App. No. 01CA2626, 2002-Ohio-3761 at ¶ 45; Cook v. Cleveland Elec. Illum. Co. (1995), 102 Ohio App.3d 417, 429; and Foust v. Magnum Restaurants, Inc. (1994), 97 Ohio App.3d 451, 455.
 {¶ 41} Another case involving a calendar machine is Brookover v.Flexmag Indus., Inc., 4th Dist. App. No. 00CA49, 2002-Ohio-2404, which involved an employer who knew that its employee was attempting to adjust air hoses over an unguarded calendar machine to improve production quality and knew that the floor was slippery. The employee tripped or slipped and fell reaching forward to catch himself and got caught in the calendar machine. The court held that a jury issue had been raised as to whether the employer committed an intentional tort even where the employee did something totally unexpected. The court stated that it had little doubt "* * * that if appellant knew that appellee was required to come into contact with an inrunning [sic], unguarded nip point as a usual day-to-day condition of his employment, a substantial certainty of injury would certainly exist." However, the court indicated that it was not certain how to proceed where the employee was doing something out of the ordinary but yet something that he and his supervisor had done a short time before. Nonetheless, the court found that there was evidence that the employer knew that working near such an area was dangerous and that the employee was substantially certain to be injured when required to work near an unguarded in-running nip-point.
 {¶ 42} In the case before us, the danger to which the employee was exposed was more than the requirement that employees feed material into an unguarded nip-point. An additional danger was imposed by the modification of the calendar machine. Mullins testified that prior to the modification an employee caught in the machine could be removed in a matter of seconds. Because of the modification, it took nearly 20 minutes to remove appellant from the calendar machine. Since the modification was made by Scandura when it knew that employees had gotten caught in the calendar machine in the past, we find that there was circumstantial evidence from which a jury could infer that Scandura knowingly exposed its employees to a danger which was substantial certainty to cause injury when it modified the calendar machine.
C. Employer required the employee to perform the dangerous task.
 {¶ 43} This element can be satisfied with "evidence that raises an inference that the employer, through its actions and policies, required the employee to engage in the dangerous task." Gibson v. DrainageProducts, Inc. 95 Ohio St.3d 171, 2002-Ohio-2008, at ¶ 24. See, also, Hannah v. Dayton Power Light Co. (1998), 82 Ohio St.3d 482,487.
 {¶ 44} Evidence to establish this element was presented in this case. Appellant was operating the calendar machine on the night of her accident at the direction of Scandura. Furthermore, Mullins testified that he was directed to train appellant to operate the calendar machine and that he instructed her to feed the collar into the calendar machine while the machine was operating. Therefore, there was evidence that appellant was operating the calendar machine on the night of her accident in the manner in which she was trained.
 {¶ 45} We conclude that appellant did set forth specific facts which show that there is a genuine issue of fact as to whether the employer had committed an intentional tort against her. Therefore, summary judgment was inappropriate in this case. Both of appellant's assignments of error are well-taken.
 {¶ 46} Having found that the trial court committed error prejudicial to appellant, the judgment of the Ottawa County Court of Common Pleas is reversed. This case is remanded to the lower court for further proceedings. Pursuant to App.R. 24, appellee is hereby ordered to pay the costs incurred on appeal.
JUDGMENT REVERSED.
Peter M. Handwork, J., and Melvin L. Resnick, J. CONCUR.
 Richard W. Knepper, J. CONCURS IN JUDGMENT ONLY.