SMITH, APPELLEE, *v.* LANDFAIR, APPELLANT.

[Cite as *Smith v. Landfair,* **135 Ohio St.3d 89, 2012-Ohio-5692.**]

*Personal injury—Immunity from liability—Equine activities—R.C. 2305.321—*
    *Definition of "spectator"—One who purposely places himself in location*
    *where equine activities are occurring and who sees such an activity is a*
    *"spectator" and hence barred from recovery for injuries as an "equine*
    *activity participant" under R.C. 2305.321(A)(3)(g).*

(No. 2011-1708—Submitted July 10, 2012—Decided December 6, 2012.)

APPEAL from the Court of Appeals for Summit County, No. 25371, 194 Ohio
App.3d 468, 2011-Ohio-3043.

_____

SYLLABUS OF THE COURT

One who purposely places himself or herself in a location where equine activities
    are occurring and who sees such an activity is a "spectator" and hence an
    "equine activity participant" within the meaning of R.C.
    2305.321(A)(3)(g).

_____

LANZINGER, J.

{¶ 1} Ohio's equine-activities-immunity statute, R.C. 2305.321, provides immunity from liability for harm sustained by an equine-activity participant allegedly resulting from the inherent risk of equine activities. In this case, we are asked to determine when an injured person is a "spectator" and therefore an "equine activity participant" whose claim for damages is barred by the statute.

{¶ 2} Because we conclude that the Ninth District Court of Appeals erred in overturning the trial court's summary judgment based on its interpretation of the word "spectator," we reverse the judgment of the court of appeals.

## I. Background

{¶ 3} This personal-injury action arises from a 2007 incident that occurred at CJS Standardbred Stables ("CJS"), located in Wayne County. The following facts are taken from deposition testimony presented to the trial court.

{¶ 4} Appellant, Donald Landfair, a licensed livestock dealer for 40 years, boarded two of his horses, Green Acre Patty ("Patty") and Green Acre Annie ("Annie") at CJS for breaking and training in harness racing. Annie was a young horse, trained to be led, but the extent of her training in other areas, such as being loaded and unloaded from a trailer, was in dispute.

{¶ 5} Appellee, Roshel Smith, the daughter of CJS's owner, worked at CJS from 2000 to 2008, assisting in the care and management of horses. As groomer and barn manager, she had the opportunity to work with Annie and knew that horses are unpredictable and inherently dangerous.

{¶ 6} On March 28, Landfair picked up Annie and Patty from CJS for off-site blacksmithing. He loaded the horses into the trailer, took them to the blacksmith, and reloaded them for return to CJS, by himself and without incident. Meanwhile, Smith had stopped by CJS to visit her father. As she was standing by the barn doorway watching her father exercise another horse on the track, Landfair unloaded Patty from the trailer. Smith said "hi" to him when he put Patty into the barn and then saw him return to the trailer to unload Annie. As he was preparing to unload Annie, an Amish wagon with two teams of horses passed the trailer, spooking the horse. According to Smith:

> First, I heard a commotion and I glanced over and Annie
> had pushed Mr. Landfair out of the trailer and Mr. Landfair was on
> the ground, and then Annie proceeded to jump out of the trailer,
> and she was starting to step on him and he still had ahold of the

[horse's lead] line, and that's when I ran after and I don't remember very much after that.

{¶ 7}   When she tried to go to Landfair's assistance, Smith was kicked in the head by the horse and received facial and head injuries.  She filed a personal-injury complaint in the Summit County Court of Common Pleas alleging that Landfair had been negligent in attempting to handle an untrained and unbroken horse known to be skittish and in failing to seek assistance in unloading the horse from its trailer.  Landfair filed a motion for summary judgment, arguing that he was immune from liability pursuant to R.C. 2305.321.

{¶ 8}   After a hearing, the trial court agreed with Smith that she was not a participant in an equine event by virtue of assisting in the control of the horse pursuant to R.C. 2305.321(A)(3)(e).   But the court concluded that R.C. 2305.321(A)(3)(g) applied to bar Smith's claim because she was a spectator, i.e., she was present at the unloading of Annie and "noticed" that event.  Thus, Smith was an "equine activity participant" when she was injured.  Summary judgment was granted in favor of Landfair.

{¶ 9}   Smith appealed, and the Ninth District Court of Appeals reversed the summary judgment, remanding the case to the trial court for further proceedings.  *Smith v. Landfair*, 194 Ohio App.3d 468, 2011-Ohio-3043, 956 N.E.2d 915.   The appellate court rejected the trial court's application of the immunity statute.   It held that Smith was not an equine-activity participant, because she was not a spectator as defined by R.C. 2305.321(A)(3)(g).  Nor was she assisting Landfair in controlling the horse within the meaning of R.C. 2305.321(A)(3)(e).   Thus, immunity did not apply.   The court of appeals

remanded the case to the trial court without ruling on the first, second, and fourth assignments of error.[1]

{¶ 10} Landfair filed a discretionary appeal with six propositions of law, one of which we accepted: "A person is a 'spectator' and thus an 'equine activity participant' under R.C. 2305.321(A)(3) if the person is a bystander or observer at an equine activity." We now hold that one who purposely places himself or herself in a location where equine activities are occurring and who sees such an activity is a "spectator" and hence an "equine activity participant" within the meaning of R.C. 2305.321(A)(3)(g). We therefore reverse the judgment of the Ninth District and remand to that court for consideration of the remaining assignments of error.

## II. Analysis

{¶ 11} In enacting Ohio's equine-activities-immunity statute, R.C. 2305.321, the General Assembly declared that

> an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person is not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity.

---

1. Smith's first assignment of error claimed that the trial court erred in concluding that R.C. 2305.321 abrogated the common-law rescue doctrine. The second assignment of error argued that Landfair's conduct was wanton. The fourth assignment of error contended that the trial court erred in finding that Landfair was "controlling" Annie. The fifth assignment of error, which claimed that the trial court erred in failing to grant Smith's motion for leave to amend her complaint to plead wanton misconduct, was overruled by the court of appeals as harmless error, because the trial court had considered the issue.

R.C. 2305.321(B)(1). " 'Equine' means a horse, pony, mule, donkey, hinny, zebra, zebra hybrid, or alpaca." R.C. 2305.321(A)(1).

{¶ 12} At the outset, we note that the dissent would hold that R.C. 2305.321 violates the Ohio Constitution, Article I, Section 16. First, neither party has raised a constitutional issue in briefs or oral argument before the court. Declaring a statute unconstitutional, sua sponte, without notice to the parties would be unprecedented.

{¶ 13} Even when one of the parties has raised a constitutional issue, we do not decide on that basis unless and until absolutely necessary. *State ex rel. Clarke v. Cook,* 103 Ohio St. 465, 134 N.E. 655 (1921), paragraph one of the syllabus (questions involving the constitutionality of statutes will not be determined by this court unless such a determination is essential to the rendition of a proper judgment in the case); *State ex rel. Herbert v. Ferguson,* 142 Ohio St. 496, 52 N.E.2d 980 (1944), paragraph two of the syllabus (constitutional questions will not be decided until the necessity for a decision arises on the record before the court); *Hall China Co. v. Pub. Util. Comm.,* 50 Ohio St.2d 206, 210, 364 N.E.2d 852 (1977) (declining to address constitutional question of retroactivity when not necessary); *State ex rel. Lieux v. Westlake,* 154 Ohio St. 412, 415-416, 96 N.E.2d 414 (1951) (constitutional validity of ordinance not addressed because administrative remedies had not been exhausted); *State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 522 N.E.2d 524 (1988) (court of appeals' sua sponte consideration of constitutionality of vehicle-forfeiture statute without notice to parties was abuse of court's discretion). We therefore decline to rule on a constitutional issue that is not before us.

*Statutory language*

{¶ 14} The General Assembly acknowledged the inherent risks that arise when people interact with horses and other animals in the category of equines.

"Inherent risk of an equine activity" means a danger or condition that is an integral part of an equine activity, including, but not limited to, any of the following:

(a) The propensity of an equine to behave in ways that may result in injury, death, or loss to persons on or around the equine;

(b) The unpredictability of an equine's reaction to sounds, sudden movement, unfamiliar objects, persons, or other animals.

R.C. 2305.321(A)(7).

{¶ 15} "Equine activity" is broadly defined in R.C. 2305.321(A)(2)(a) as

(i) An equine show, fair, competition, performance, or parade that involves an equine and an equine discipline, including, but not limited to, dressage, a hunter and jumper show, grand prix jumping, a three-day event, combined training, a rodeo, driving, pulling, cutting, reining, team penning, barrel racing, polo, steeplechasing, English or western performance riding, endurance or nonendurance trail riding, western games, hunting, packing, and recreational riding;

(ii) An equine or rider training, teaching, instructing, testing, or evaluating activity, including, but not limited to, a clinic, seminar, or symposium;

(iii) The boarding of an equine, including, but not limited to, normal daily care of an equine;

(iv) The trailering, loading, unloading, or transporting of an equine;

(v) The riding, inspecting, or evaluating of an equine owned by another person, regardless of whether the owner has

6

received anything of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect, or evaluate it;

(vi) A ride, trip, hunt, branding, roundup, cattle drive, or other activity that involves an equine and that is sponsored by an equine activity sponsor, regardless of whether the activity is formal, informal, planned, or impromptu;

(vii) The placing or replacing of horseshoes on an equine, the removing of horseshoes from an equine, or the trimming of the hooves of an equine;

(viii) The provision of or assistance in the provision of veterinary treatment or maintenance care for an equine;

(ix) The conducting of procedures or assistance in the conducting of procedures necessary to breed an equine by means of artificial insemination or otherwise.

{¶ 16} As this broad language shows, almost every activity associated with a horse is an "equine activity." [2] The General Assembly used similarly broad language in defining "equine activity participant":

"Equine activity participant" means a person who engages in any of the following activities, regardless of whether the person is an amateur or a professional or whether a fee is paid to participate in the particular activity:

(a) Riding, training, driving, or controlling in any manner an equine, whether the equine is mounted or unmounted;

---

2. Horse racing is expressly excluded. R.C. 2305.321(A)(2)(b).

(b) Being a passenger upon an equine;

(c) Providing medical treatment to an equine;

(d) Conducting procedures of [*sic*] assisting in conducting procedures necessary to breed an equine by means of artificial insemination or otherwise;

(e) Assisting a person who is engaged in an activity described in division (A)(3)(a), (b), (c), or (d) of this section;

(f) Sponsoring an equine activity;

(g) *Being a spectator at an equine activity.*

(Emphasis added.)  R.C. 2305.321(A)(3).

*Judicial interpretation*

{¶ 17} The word "spectator" is not defined in the statute.  It is undisputed that Landfair was involved in an equine activity when he was loading and unloading his horses; what is disputed is whether Smith was an equine activity participant by virtue of being a spectator when she was injured.  If she was, R.C. 2305.321(A)(3)(g) applies, and her claim is barred.

{¶ 18} In interpreting statutory language, a court's paramount concern is legislative intent. *State v. S.R.*, 63 Ohio St.3d 590, 594, 589 N.E.2d 1319 (1992). Unless expressly defined, the words and phrases contained in Ohio's statutes are to be given their plain, common, ordinary meaning and are to be construed "according to the rules of grammar and common usage."  R.C. 1.42; *Kunkler v. Goodyear Tire & Rubber Co.,* 36 Ohio St.3d 135, 137, 522 N.E.2d 477 (1988); *State ex rel. Celebrezze v. Allen Cty. Bd. of Commrs.*, 32 Ohio St.3d 24, 27, 512 N.E.2d 332 (1987).  Indeed, in the few existing cases construing the equine-activity statute, Ohio courts have looked to common dictionary definitions to assist them.  In addition to the trial court and the appellate court in this case, *see Allison v. Johnson,* 11th Dist. No. 2000-T-0116, 2001 WL 589384, *5 (June 2,

2001); *Gibson v. Donahue,* 148 Ohio App.3d 139, 772 N.E.2d 646 (1st Dist.2002).

{¶ 19} In *Allison*, relying on dictionary definitions, the court of appeals rejected the plaintiff's argument that she was merely a bystander rather than a spectator when she was injured while watching the defendant lead a horse into a barn. When the defendant turned to close the gate behind him, the horse jumped backwards, dislodging a piece of the gate, which flew off and struck the plaintiff in the face. The court found no distinction between the plain and ordinary meaning of "spectator" and "bystander" and concluded that the plaintiff "was an equine activity participant by virtue of being a spectator, to-wit: an observer, watcher, or bystander." *Id.* at *7. Nonetheless, the court made clear that it was not approving immunity in all circumstances in which a person happens to see a horse and is injured by it.

{¶ 20} In the instant case, the Ninth District considered several dictionary definitions of "spectator":

> The common, ordinary meaning of spectator is "[o]ne who attends and views a show, sports event or the like." The American Heritage Dictionary of the English Language (1981) 1241. See also *Allison* at *5 (examining common dictionary definitions of spectator, including " 'one that looks on or beholds; * * * one witnessing an exhibition[;' " and " '] a person who watched without participating' ").[3]

*Smith v. Landfair,* 194 Ohio App.3d 468, 2011-Ohio-3043, 956 N.E.2d 915, ¶ 14.

{¶ 21} The court observed:

---

3. The *Allison* court attributed these definitions to Webster's Third New International Dictionary 2188 (1986) and The Random House Dictionary, Concise Edition 840 (1983).

While one might ordinarily conclude that someone who is a spectator is viewing an event or exhibition, such as a horse show, the legislature has envisioned that a person can be a spectator of any equine activity, including the trailering of a horse and the normal daily care of a horse. See R.C. 2305.321(A)(2)(a)(iii) and (iv); R.C. 2305.321(A)(3)(g). For example, one could be a spectator while watching a farrier engaged in the process of placing shoes on a horse. Nonetheless, the word "spectator" should not be interpreted so that any individual who glances at a horse and is thereafter injured by it becomes a spectator of an equine activity and thereby an equine-activity participant. Indeed, such a view would distort the common and ordinary meaning of the word and would require a conclusion that any person, even a mail carrier who happens to momentarily glance at a horse or has some awareness in his peripheral vision that a horse is engaged in some activity, is deemed a spectator.

*Id.* at ¶ 15.

{¶ 22} The court then decided that to be a spectator, one must purposely watch the activity in question and concluded that Smith was not a "spectator," because she was not "watching" the equine activity at issue, namely, Landfair unloading Annie. Instead, she saw him "only out of her peripheral vision." *Id*. at ¶ 16.

*Parties' positions*

{¶ 23} Landfair argues that the court of appeals unduly restricted the broad language of R.C. 2305.321(A)(2) and (3). He contends that the trial court correctly found that Smith was a spectator by "being present at the unloading of

Annie and 'noticing' the events that transpired leading up to her injury." Landfair emphasizes that by voluntarily positioning herself at the stable area before he arrived and remaining at the stable area as he unloaded his horses, Smith placed herself in a position to watch, see, or interact with an equine activity and so subjected herself to the immunity statute. Landfair finally argues that his interpretation is consistent with the General Assembly's purpose in enacting the statute, which is to address "the inherent risks that arise when large, unpredictable animals like horses are in close contact with people."

{¶ 24} Smith maintains that the court of appeals' interpretation was correct in narrowing the definition of "spectator" to require an intent to see or watch a specific equine activity. Otherwise, the immunity statute covers all victims of the inherent risk of equine activity, rendering meaningless the limitation of immunity to an "equine activity participant." Smith argues that a spectator is someone who has intentionally placed himself or herself for the purpose of seeing an event. Because she did not place herself at the barn doorway intending to watch Landfair unloading his horses, she was not a spectator of that equine activity. Smith also asserts that the court should give this narrower interpretation to the word "spectator" to avoid eliminating more tort claims than the General Assembly intended.

*Definition of "spectator"*

{¶ 25} The parties have offered us two competing interpretations. On the one hand, a spectator is merely a bystander who happens to be in the vicinity of an equine activity. On the other hand, a spectator is someone who purposely goes to a place where equine activities take place, intending to watch. In our view, the first is too broad and the second is too narrow.

{¶ 26} Being a mere bystander or passerby is not enough. First, the characteristics of the other types of "equine activity participants" listed in R.C. 2305.321(A)(3)(a) to (f) imply that a more active role was intended. All the other

11

categories of participants describe riding, controlling, treating, and breeding the animals. These activities all involve purposeful, active contact with an equine, and to interpret "spectator" as extending to a bystander would inject disharmony among the subsections. Words in a statute must be read in context, R.C. 1.42, and we do not believe that the context in which the term "spectator" was placed permits such an incongruous reading.

{¶ 27} Moreover, given the purpose of the statute, we conclude that a person must deliberately put himself or herself in a position of exposure to the "inherent risk" of proximity to horses before immunity can apply. The person need not be there to watch an equine activity in the classic sense of a spectator at a show or event. It is the purposeful placement in an area of exposure that draws the immunity. But the element of seeing cannot be completely eliminated, or the word "spectator" would be drained of all meaning. Thus, we hold that one who purposely places himself or herself in a location where equine activities are occurring and who sees such an activity is a "spectator" and hence an "equine activity participant" within the meaning of R.C. 2305.321(A)(3)(g).

{¶ 28} Here, the facts encompass one of the situations envisioned by the legislature. Smith was injured due to an "inherent risk of equine activity," which includes the propensity of a horse to behave in ways that may result in injury. R.C. 2305.321(A)(7)(a). In other words, horses are unpredictable. Although Smith was not at the stable that day to work, she voluntarily placed herself in a location where equine activities were taking place, saw the attempted unloading of Annie from the trailer, and was injured due to the inherent risk of that activity. Her proximity to Landfair's horse was not due to chance. She was at a horse stable to see her father, the stable owner, and was standing near the place where an "equine activity," the unloading of a horse from a trailer, was occurring. R.C. 2305.321(A)(2)(a)(iv). Thus, Smith's personal-injury claim is barred.

12

**{¶ 29}** We disagree with the Ninth District in this case. We reverse the judgment of the court of appeals on its holding that Smith was not a spectator as a matter of law because she was not watching Landfair unload Annie at the time she was injured. As we have said, intent to watch is not necessary to be a "spectator." As noted above, the statute at issue in this case is broadly written to address the inherent risks that arise when horses are near people, and it is the injured person's voluntary placement in a position of known exposure to that risk that is key. Merely glancing at a horse would not render someone a spectator of equine activity. Simply being in the vicinity of equine activities is not enough. Rather, the person must be there voluntarily, aware that equine activities are occurring.

**{¶ 30}** In applying our definition, we hold that there are no material issues of fact regarding whether Smith was an equine-activity participant. She stood near the barn door at her father's stable to watch him exercise a horse, an equine activity in and of itself. Although she was not specifically intending to watch Landfair unload Annie from his trailer, she knew that he was unloading the horse and saw it happening. Whether her perception of the unloading was based on direct viewing or mere peripheral vision is not determinative. She had voluntarily placed herself in a location where equine activities were taking place, thus subjecting herself to the potential danger that arises from a horse's unpredictable nature.

**{¶ 31}** It is important to note, however, that not every person is a spectator when a horse is present. There is a measure of purposefulness needed to place oneself in the horse's vicinity. And so a mail carrier delivering mail at a farm who is injured by a runaway horse is not a spectator. One must go to a place where equine activities are occurring before being deemed to be a spectator within the meaning of R.C. 2305.321(A)(3)(g).

### III. Conclusion

{¶ 32} Landfair is entitled to immunity pursuant to R.C. 2305.321(B)(1). Nevertheless, issues remain to be resolved in the court of appeals. Smith maintained in her second assignment of error that any immunity from liability conferred by R.C. 2305.321(B)(1) was forfeited because Landfair's conduct was wanton under R.C. 2305.321(B)(2)(d). She asserted in her fourth assignment of error that the trial court erred in finding that Landfair was "controlling" Annie within the meaning of R.C. 2305.321(A)(3)(A). And Smith's first assignment of error claimed that the trial court erred in concluding that R.C. 2305.321 abrogated the common-law rescue doctrine. Due to its ruling on the third assignment of error, the court of appeals held these assignments of error to be moot. We therefore remand the case to the Ninth District Court of Appeals to consider the remaining assignments of error.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and LUNDBERG STRATTON, O'DONNELL, CUPP, and MCGEE BROWN, JJ., concur.

PFEIFER, J., dissents.

————————————

**PFEIFER, J., dissenting.**

{¶ 33} The Ohio Constitution, Article I, Section 16 states: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." This court has stated, "This section of the Ohio Constitution protects the right to seek redress in Ohio's courts when one is injured by another." *Brennaman v. R.M.I. Co.*, 70 Ohio St.3d 460, 466, 639 N.E.2d 425 (1994).

**{¶ 34}** The majority opinion states that "Smith was injured due to an 'inherent risk of equine activity * * *.' " Smith was not injured because of an inherent risk; she was injured because she went out of her way to help someone she was not obligated to help and was injured in the process. Next time, she would be well served to sit back and watch a person get trampled. The upshot of this case is to encourage people encountering a dangerous situation involving a horse to watch, rather than attempt to help. Of course, even in that situation, if the horse walked over to the person watching and kicked her, there would be no recovery because that person would be a spectator.

**{¶ 35}** The broad scope of R.C. 2305.321 as enacted by the General Assembly and as interpreted by this court effectively renders Article I, Section 16 toothless with respect to equine-related injuries. It is hard to envision broader immunity than that conferred by R.C. 2305.321. Even the benighted sovereign immunity has significant exceptions. R.C. 2305.321 provides blanket immunity to horse owners and, in doing so, contravenes the Ohio Constitution, Article I, Section 16. I would adopt the sound reasoning of the court of appeals. I dissent.

_____

Reinhardt Law Firm, Ltd., and John K. Reinhardt, for appellee.

Hanna, Campbell & Powell, L.L.P., Kenneth A. Calderone, and John R. Chlysta, for appellant.

Giorgianni Law, L.L.C., and Paul Giorgianni, urging affirmance for amicus curiae Ohio Association for Justice.

Green & Green Lawyers, L.P.A., and Thomas M. Green, urging reversal for amicus curiae Ohio Horseman's Council.

_____