[Cite as *Cornett v. Red Stone Group, Inc.*, 2015-Ohio-3376.]


**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| CARRIE CORNETT | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 26657 |
| | : | |
| v. | : | T.C. NO. 11CV7796 |
| | : | |
| RED STONE GROUP, INC., et al. | : | (Civil appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the __21st__ day of __August__, 2015.

. . . . . . . . . .

SEAN BRINKMAN, Atty, Reg. No. 0088253 and AARON G. DURDEN, Atty. Reg. No.
0039862, 10 W. Monument Avenue, Dayton, Ohio 45402
        Attorneys for Plaintiff-Appellant

EDWARD J. DOWD, Atty. Reg. No. 0018685 and JOSHUA R. SCHIERLOH, Atty. Reg.
No. 0078325, 8163 Old Yankee Street, Suite C, Dayton, Ohio 45458
        Attorneys for Defendant-Appellee Red Stone Group, Inc.

JOHN P. ARCHER, Atty. Reg. No. 0073721, 1375 E. Ninth Street, 29th Floor, Cleveland,
Ohio 44114
        Attorney for Defendant-Appellee Medical Mutual of Ohio

. . . . . . . . . . . .

DONOVAN, J.

        **{¶ 1}**  This matter is before the Court on the Notice of Appeal of Carrie Cornett,

filed April 16, 2015. Cornett appeals from the March 26, 2015 Decision of the trial court that granted the motion for summary judgment of Red Stone Group, Inc. ("Red Stone"), on Cornett's claims of negligence and premises liability.

{¶ 2} Cornett filed her Complaint on October 28, 2011, alleging that Red Stone owned and operated Schumaker Stables ("the Stables") in Carlisle, where Cornett provided daily care for the horses boarded there. Cornett further alleged that Red Stone maintained a defective gate and fence that enclosed the horses when they were out to pasture, and that on October 29, 2009, she was trampled by the horses after they escaped from their enclosure due to the defective gate. Cornett alleged that she suffered skull fractures and leg lacerations as a result.

{¶ 3} In its Motion for Summary Judgment, Red Stone asserted that Cornett's claims were barred by R.C. 2305.321, which provides immunity from liability to an "equine activity sponsor," for harm sustained by an "equine-activity participant," allegedly resulting from the inherent risk of "equine activity." Red Stone further asserted that the exception to immunity set forth in R.C. 2305.321(B)(2)(c), namely that immunity is forfeited if an equine activity sponsor fails to warn an equine-activity participant of a "dangerous latent condition" on the premises at which the harm occurs, does not apply. Red Stone asserted that based "upon [Cornett's] own testimony, there was nothing latent or hidden about the defective gate, which she claims contributed to the cause of her harm. * * * [Cornett] is unable to claim that she was unaware of the risk present by the described condition of the gate."

{¶ 4} In response, Cornett asserted as follows:

The equine immunity statute, R.C. § 2305.321, does not bar Ms.

Cornett's claim. Defendant Red Stone was an equine activity sponsor because it operated an equine facility. * * * However, Ms. Cornett was not an equine activity participant at the time of the incident. Ms. Cornet had put the horses out to pasture, cleaned the stalls, and was picking everything up to leave when she heard a noise. * * * Ms. Cornett ran to the back gate to see what was going on, and the last thing she remembered was running out the door. Ms. Cornett was not riding, training, driving, or controlling the horses in any manner. * * * Although Defendant may argue Ms. Cornett was attempting to control the horses, she could not have possibly controlled the horses as they had been turned out and were in a separate, gated off area. * * *

Additionally, Ms. Cornett was not engaged in an equine activity at the time of the incident. Defendant argues that Ms. Cornett was engaged in an equine activity, specifically, the boarding and daily care of a horse. However, Ms. Cornett had completed her boarding duties and was leaving the stable at the time she heard the noise. * * *. Even if the court determines Ms. Cornett was still engaged in the boarding and daily care of horses, there was no inherent risk in that equine activity. Defendant argues there is an inherent risk when cleaning stall[s] because at any moment a horse could come running into the barn. There was no inherent risk in cleaning stalls on the day of the incident because the horses were previously put out to pasture, in a separately gated area. * * * Defendant's failure to maintain the gate in a condition adequate to contain the horses

does not create an inherent risk. Accordingly, the equine immunity statute does not apply because Ms. Cornett was not engaged in an equine activity and there was no inherent risk.

{¶ 5} Finally, Cornett asserted that even if equine immunity applied, Red Stone forfeited immunity pursuant to R.C. 2305.321(B)(2)(a), which provides that immunity is forfeited where an equine activity sponsor provides defective equipment, and the defect proximately causes harm. According to Cornett, "Red Stone provided the gate for Ms. Cornett to use to let horses in and out of the pasture. The gate is equipment as it is a fixed asset for Red Stone." Cornett further asserted as follows:

Ms. Cornett testified that the gate would not stay and had to be repaired on a regular basis, which she considered it to be defective. (sic) * * * Cornett indicated the gate in place to allow the horses in and out of the pasture was old and rusty. * * * The gate was hinged on a hinge that repeatedly came off. * * * The hinges were coming out of the posts. * * * Additionally, the gate was not strong enough to hold a horse. * * *

{¶ 6} Cornett asserted that Red Stone "had actual and/or constructive knowledge of the defective gate. * * * The gate proximately caused the harm because the horses could not have trampled Ms. Cornett if the gate properly contained the horses to the pasture area. * * *"

{¶ 7} In reply, Red Stone noted that Cornett "apparently believes that she was not an equine activity participant because she had completed her morning chores," and notes that she "overlooks the simple fact that her daily boarding obligations are not completed until her afternoon tasks are finished as well." Red Stone asserted that Cornett "recalled

hearing a 'metal sound' and *thought that a horse was stuck in the gate for the pasture*."

According to Red Stone, Cornett "ran toward the exit of the barn to provide aid because she is responsible for the daily care and maintenance of the horses at the stable. Making sure the horses under her care and control are safe and unharmed is certainly part of the normal daily care associated with boarding horses."

{¶ 8} Red Stone asserted that Cornett acknowledged the inherent risks associated with boarding a horse in her deposition. Red Stone asserted that while Cornett argued that her injuries were caused by a defective gate, "the gate is a fixed object. [Cornett's] harm was caused by the horse that unexpectedly charged through the gate. In sum, [Cornett] was injured by the inherent risk associated with performing an equine activity. Her claims for negligence and premises liability are barred by R.C. 2305.321(B)(1)."

{¶ 9} Red Stone argued that it did not forfeit premises liability, and that Cornett "made no attempt to rebut that the allegedly defective aspect of the gate was not hidden or concealed in support of this premises liability action. Rather, [Cornett] now maintains that Red Stone knowingly provided her with faulty or defective equipment as to invoke the exception to immunity under R.C. § 2305.321(B)(2)(a). Red Stone asserted as follows regarding R.C. 2305.321(B)(2)(a):

> This exception to immunity explicitly references "equipment or tack."
> Horse tack commonly includes *equipment* such as saddles, stirrups,
> bridles, halters, reins, bits, harnesses, martingales, and breastplates. By
> virtue of the fact that the term "equipment" in the foregoing exception is
> joined to the term "tack" by using the conjunction "or" – a conjunctive phrase

used to connect alternative terms for the same thing – it can be logically assumed that this exception was not intended to apply to the conditions affecting the safety of the premises sponsoring an equine activity. Rather, this section was meant to forfeit Red Stone's immunity under the EALA when it provides its participants with a defective saddle or other similar equipment.

Since the term "equipment" is not defined under the EALA, [Cornett]referred to the definition of this word that is provided by Merriam-Webster. See,www.merriam-webster.com/dictionary/equipment. [Cornett] inaccurately cites the definition of "equipment" in her memorandum. * * * According to Merriam-Webster, equipment is defined as:

the set of articles or physical resources serving to equip a person or thing: as *(1)* **:** the implements used in an operation or activity **:** apparatus < sports *equipment> (2)* **:** all the fixed assets other than land and buildings of a business enterprise *(3)* **:** the rolling stock of a railway.

See, www.merriam-webster.com/dictionary/equipment.

[Cornett's] argument omits the first subsection of this definition (the implements used in an operation or activity) and focuses on the second enumerated subsection, which is essentially an accounting definition of the term. * * * The implements, otherwise considered riggings or tools, of an activity is meant to include only those items used in riding a horse, such as the reins, helmet, bridles, etc., and not fixtures such as a gate. The legislature's intent to only include such equipment as described above is

highlighted by the use of the conjoined term "tack," which does not include a gate.

Red Stone's position is further buttressed by the undeniable truth that it cannot "provide" a gate to an individual; unlike a saddle. A fence or gate exists as part of the premises or land where an equine activity is sponsored. Hence, the very reason why the EALA included a specific exception to immunity for the harm caused by a dangerous, latent condition of the land or premises, which is separate and distinct from the exception related to faulty or defective equipment. * * *

{¶ 10} Finally, Red Stone asserted that in "an effort to avoid a dispositive decision precluding her legal claims, [Cornett] is attempting to circumvent the intent of R.C. § 2305.321(B)(2)(a) by arguing that [the] term 'equipment' includes aspects of land or premises sponsoring an equine activity."

{¶ 11} In sustaining Red Stone's motion for summary judgment, the trial court initially discussed Ohio's open-and-obvious doctrine, noting that "[g]enerally, the owner or occupier of land owes an invitee the duty of ordinary care and must maintain the land or premises in a reasonably safe condition. * * * An owner is under no duty, however, to protect a person from known dangers or dangers which are so obvious and apparent that the person should reasonably be expected to discover them and protect himself from them." The trial court further noted that the "Second District has held that 'the crucial inquiry is whether an invitee exercising ordinary care under the circumstances would have seen and been able to guard himself against the condition.'"

{¶ 12} The trial court then addressed the Equine Activity Liability Act and further

cited *Smith v. Landfair*, 135 Ohio St.3d 89, 2012-Ohio-5692, 984 N.E.2d 1016, in which the Ohio Supreme Court "explained that R.C. 2305.321(A)(7) recognizes that 'horses are unpredictable,' and, thus, reasoned, in that case, that the Ohio General Assembly did not intend for an equine activity [sponsor] to suddenly become liable when a horse acted in an unpredictable manner."

{¶ 13} The trial court determined as follows:

Here, it is undisputed that [Cornett's] claims for negligence and premises liability constitute civil[] actions for damages for injury subject to the immunity set forth in Ohio's equine-immunity statute. Based upon [Cornett's] testimony, she was aware of the danger associated with the gate in its condition and the danger presented by the gate was open and obvious to her based upon her knowledge of the gate's condition. It is also undisputed that Defendant Red Stone is an equine-activity sponsor. At issue are whether [Cornett] was an equine activity participant at the time of her injury; whether [Cornett's] injuries resulted from an inherent risk of an equine activity; and whether [Red Stone] provided faulty or defective equipment in the gate that proximately caused [Cornett's] injuries, thereby divesting [Red Stone] of its immunity.

* * * In this case, [Cornett] voluntarily placed herself in a location where equine activities were taking place and engaged in the normal daily care of several horses, which included the acts of grooming and feeding the horses and putting the horses out to pasture. [Cornett's] proximity to the horses was not due to chance, as she worked at the Stables during the

week, thereby purposely placing herself in a location where equine activities were occurring. Accordingly, the court finds that [Cornett] was an "equine activity participant" for purposes of R.C. 2305.321.

Next, * * * [w]hile [Cornett] argued that she was not engaged in an "equine activity" at the precise time of her injury, she was still working to complete her duties as barn manager, which included providing care to the horses. Thus, the court finds that [Cornett] was engaged in an "equine activity" at the time of her injury.

Third, as to whether [Cornett's] injuries resulted from an inherent risk of an equine activity, R.C. 2305.321(A)(7) recognizes that horses have a propensity to behave in ways that may result in injury to persons around the horses and that horses are unpredictable. * * * Here, [Cornett] was injured due to an inherent risk of equine activity, which included the propensity of horses to behave in unpredictable ways that may result in injury, even at a time when [Cornett] was providing direct care to the horses. Again, [Cornett] was at the Stables that day to work, and, thus, she voluntarily placed herself in a location where equine activities were taking place, heard noises coming from the pasture, went to investigate those noises, and was injured due to the inherent risk of that activity.

Finally, * * * it can be logically assumed that [the immunity exception in R.C. 2305.321(B)(2)(a)] was not intended to apply to conditions that affect the safety of the premises, like a gate. Additionally, [Red Stone] argued that there is a specific exception to immunity for the harm caused by

a dangerous, latent condition of the land or premises as set forth above under R.C. 2305.321(B)(2)(c), which is separate and distinct from the exception related to faulty or defective equipment. In pointing to the exception caused by a latent condition of the land or premises, [Red Stone] argued that [Cornett] was fully aware of the structural integrity of the gate, and, therefore, [Cornett] is unable to claim that she was unaware of a risk associated with the condition of the gate.

The court finds [Red Stone's] argument compelling. Moreover, unless expressly defined, the words and phrases contained in Ohio's statutes are to be given their plain, common, ordinary meaning and are to be construed according to the rules of grammar and common usage. In the few existing cases construing the equine-activities-immunity statute, Ohio courts have looked to common dictionary definitions to assist them. "Equipment" is defined as "the articles or implements used for a specific purpose or activity (esp. a business operation)." *Black's Law Dictionary* 578 (8th ed. 2004). In consideration of the definition of equipment, and the use of the term "equipment" in conjunction with the term "tack" in the immunity exception, the court finds that a gate does not constitute articles or implements used for a specific purpose or activity and was not intended to fall within the immunity exception. Thus, the court finds that [Cornett] has failed to set forth an exception to [Red Stone's] immunity under the equine-activities immunity statute, and, thus, [Red Stone] is not divested of its immunity under R.C. 2305.321.

Thus, based on the foregoing, and even construing the evidence in favor of [Cornett], the court finds that no genuine issue of material fact remains for trial, and [Red Stone] is entitled to judgment as a matter of law. The court specifically finds that [Cornett] was an equine activity participant at the time of her injury; [Cornett] was engaged in an equine activity at the time of her injury; [Cornett's] injuries resulted from an inherent risk of an equine activity; and the allegedy defective gate did not constitute faulty or defective equipment or tack under the exceptions to immunity provision. The court further finds that [Cornett] was aware of the risk associated with the gate and the defect was open and obvious. * * *

{¶ 14} Cornett asserts the following assignment of error:

THE TRIAL COURT ERRED IN GRANTING SUMMARYJUDGMENT IN FAVOR OF DEFENDANT.

a. Defendant is not entitled to judgment as a matter of law because the equine immunity statute does not bar Ms. Cornett's claim.

b. Even if equine immunity applied, [Red Stone] is not entitled to judgment as a matter of law because [Red Stone] forfeited immunity under R.C. 2305.321(B)(2).

{¶ 15} As this Court has previously noted:

Summary judgment is appropriate when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most

strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010–Ohio–4505, 936 N.E.2d 481, ¶ 29; *Sinnott v. Aqua–Chem, Inc.*, 116 Ohio St.3d 158, 2007–Ohio–5584, 876 N.E.2d 1217, ¶ 29. When reviewing a summary judgment, an appellate court conducts a de novo review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). "De Novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 119–20, 413 N.E.2d 1187 (1980). Therefore, the trial court's decision is not granted deference by the reviewing appellate court. *Brown v. Scioto Cty. Bd. Of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist. 1993).

*Huntington Natl. Bank v. Payson,* 2d Dist. Montgomery No. 26396, 2015-Ohio-1976, ¶ 14.

{¶ 16} Cornett asserts that "the equine immunity statute does not bar [her] claim because she was not an equine activity participant, she was not engaged in an equine activity, and there was not an inherent risk of an equine activity." Cornett further asserts that the trial court "erred in ruling that Red Stone did not forfeit immunity under the statute in the present case. * * * Red Stone provided the gate for Ms. Cornet to use to let horses in and out of the pasture. The gate is an article used for the specific purpose of containing horses in the pasture in Red Stone's business operation." Cornett asserts

that the "gate is equipment according to the common, ordinary meaning of 'equipment.'" Cornett asserts that the "gate proximately caused the harm because the horses could not have trampled Ms. Cornet if the gate properly contained the horses to the pasture area." Cornett asserts that "[i]nsofar as * * * Red Stone provided a defective gate, its knowledge of the defect, and the defective gate proximately caused Ms. Cornett's injuries, it cannot escape liability for usage of the equine immunity." (sic)

**{¶ 17}** As the Ohio Supreme Court noted in *Smith v. Landfair* :

> In enacting Ohio's equine-activities-immunity statute, R.C. 2305.321, the General Assembly declared that an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person is not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity.

*Id.*, ¶ 11.

**{¶ 18}** R.C. 2305.321(A)(1) provides that " 'Equine' means a horse, pony, mule donkey, hinny, zebra, zebra hybrid, or alpaca." R.C. 2305.321(A)(2)(a) provides:

> "Equine activity" means any of the following:
>
> (i) An equine show, fair, competition, performance, or parade that involves an equine and an equine discipline, including, but not limited to, dressage, a hunter and jumper show, grand prix jumping, a three-day event, combined training, a rodeo, driving, pulling, cutting, reining, team penning, barrel racing, polo, steeplechasing, English or western performance riding, endurance or nonendurance trail riding, western

games, hunting, packing, and recreational riding;

(ii) An equine or rider training, teaching, instructing, testing, or evaluating activity, including, but not limited to, a clinic, seminar, or symposium;

(iii) *The boarding of an equine, including, but not limited to, normal daily care of an equine;*

(iv) The trailering, loading, unloading, or transporting of an equine;

(v) The riding, inspecting, or evaluating of an equine owned by another person, regardless of whether the owner has received anything of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect, or evaluate it;

(vi) A ride, trip, hunt, branding, roundup, cattle drive, or other activity that involves an equine and that is sponsored by an equine activity sponsor, regardless of whether the activity is formal, informal, planned, or impromptu;

(vii) The placing or replacing of horseshoes on an equine, the removing of horseshoes from an equine, or the trimming of the hooves of an equine;

(viii) The provision of or assistance in the provision of veterinary treatment or maintenance care for an equine;

(ix) The conducting of procedures or assistance in the conducting of procedures necessary to breed an equine by means of artificial insemination or otherwise.

(Emphasis added).

{¶ 19} R.C. 2305.321(A)(3) provides as follows:

"Equine activity participant" means a person who engages in any of the following activities, regardless of whether the person is an amateur or a professional or whether a fee is paid to participate in the particular activity:

(a) *Riding, training, driving, or controlling in any manner an equine, whether the equine is mounted or unmounted;*

(b) Being a passenger upon an equine;

(c) Providing medical treatment to an equine;

(d) Conducting procedures of [sic] assisting in conducting procedures necessary to breed an equine by means of artificial insemination or otherwise;

(e) Assisting a person who is engaged in an activity described in division (A)(3)(a), (b), (c), or (d) of this section;

(f) Sponsoring an equine activity;

(g) Being a spectator at an equine activity.

(Emphasis added).

{¶ 20} R.C. 2305.321(A)(4) provides:

"Equine activity sponsor" means either of the following persons:

(a) A person who, for profit or not for profit, sponsors, organizes, or provides a facility for an equine activity, including, but not limited to, a pony club, 4-H club, hunt club, riding club, or therapeutic riding program, or a class, program, or activity that is sponsored by a school, college, or

university;

*(b) An operator or promoter of, or an instructor at, an equine facility, such as a stable, clubhouse, pony ride, fair, training facility, show ground, or arena at which an equine activity is held.*

(Emphasis added).

{¶ 21}  R.C. 2305.321(A)(7) defines "inherent risk of an equine activity' as follows:

"Inherent risk of an equine activity" means a danger or condition that is an integral part of an equine activity, including, but not limited to, any of the following:

*(a) The propensity of an equine to behave in ways that may result in injury, death, or loss to persons on or around the equine;*

*(b) The unpredictability of an equine's reaction to sounds, sudden movement, unfamiliar objects, persons, or other animals;*

(c) Hazards, including, but not limited to, surface or subsurface conditions;

(d) A collision with another equine, another animal, a person, or an object;

(e) The potential of an equine activity participant to act in a negligent manner that may contribute to injury, death, or loss to the person of the participant or to other persons, including, but not limited to, failing to maintain control over an equine or failing to act within the ability of the participant.

(Emphasis added).

{¶ 22} " 'Tort action' means a civil action for damages for injury, death, or loss to person or property. 'Tort action' does not include a civil action for damages for a breach of contract or another agreement between persons." R.C. 2305.321(A)(9).

{¶ 23} R.C. 2305.321(B)(1) provides:

Except as provided in division (B)(2) of this section and subject to division (C) of this section, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person is not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity. Except as provided in division (B)(2) of this section and subject to division (C) of this section, an equine activity participant or the personal representative of an equine activity participant does not have a claim or cause of action upon which a recovery of damages may be based against, and may not recover damages in a tort or other civil action against, an equine activity sponsor, another equine activity participant, an equine professional, a veterinarian, a farrier, or another person for harm that the equine activity participant allegedly sustained during an equine activity and that resulted from an inherent risk of an equine activity.

{¶ 24} R.C. 2305.321(B)(2) provides that the "immunity from tort or other civil liability conferred by division (B)(1) of this section is forfeited if any of the following circumstances applies:"

(a) An equine activity sponsor, equine activity participant, equine

professional, veterinarian, farrier, or other person provides to an equine activity participant faulty or defective equipment or tack and knows or should know that the equipment or tack is faulty or defective, and the fault or defect in the equipment or tack proximately causes the harm involved.

(b) An equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person provides an equine to an equine activity participant and fails to make reasonable and prudent efforts to determine the equine activity participant's ability to safely engage in the equine activity or to safely manage the equine based on the equine activity participant's representations of the participant's ability, the equine activity participant fails to safely engage in the equine activity or to safely manage the equine, and that failure proximately causes the harm involved.

(c) The harm involved is proximately caused by a dangerous latent condition of the land on which or the premises at which the harm occurs, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person owns, leases, rents, or otherwise lawfully possesses and controls the land or premises and knows or should know of the dangerous latent condition, but does not post conspicuously prior to the time of the harm involved one or more signs that warn of the dangerous latent condition.

(d) An act or omission of an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person constitutes a willful or wanton disregard for the safety of an equine activity

participant and proximately causes the harm involved.

(e) An equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person intentionally causes the harm involved.

{¶ 25} In her deposition, Cornett testified that in prior litigation, it was determined that she was not an employee of the Stables. She testified to her belief that Ron and Dorothy Schumaker own and operate the Stables, and she stated that she does not know who Red Stone is. According to Cornett, she "saw an ad on Craiglist of someone to manage the barn and I went to meet with Ron, and we settled the deal. That's when I started," in August, 2008. Cornett stated that she agreed with Ron that she would "collect the board from the boarders," and then "pay Ron and I would get to board my horses free." Cornett stated that she "bought the sawdust and I bought the grain and I paid Ron for the hay." She stated that four boarders paid $250.00 a month, or a thousand dollars, and that she paid Ron $400.00 a month from that amount.

{¶ 26} She testified that the Stables consist of a barn with stalls, an indoor riding arena, and pastures for the horses. She stated that at the time of her accident, there were eight horses at the barn that she was caring for, and that two of them were hers and two belonged to Ron. Cornett stated that she has owned horses since she was a teenager. She stated that she is aware of the unpredictable nature of horses. Cornett stated that when spooked, horses typically run to the barn, "their safety zone." In describing her routine at the Stables, Cornett stated that she "would come in at about 8:00 [a.m.] and start feeding hay and grain, watering horses, giving them time to eat their breakfast. After they were done with that, I would turn them out." She stated that the

horses "would go * * * on out to the field themselves," and she would shut the gate and begin cleaning the stalls. After the stalls were cleaned, Cornett would leave the Stables at around 11:00 to 11:30. Cornett stated that she would return around 4:00 or 5:00 and "start all over again." She stated that she would lead the horses back to their stalls one by one by means of a halter, feed them, and then leave for the night.

{¶ 27} On the morning of the accident, Cornett testified that she "got done with my chores and was picking everything up and I heard the noises in the back, the metal going crazy. I just ran back there to see what was going on. As soon as I ran out the door, that's the last thing I remember." She stated that the gate to the field was "old and rusty," and that it "was hinged on a hinge that continually came off." Cornett stated that the "hinges were coming out of the posts. It was rotted." She testified that the gate "can't hold a horse. It's not strong enough to hold that many horses coming against it. Horses are strong." Cornett stated that she was aware of the problem with the gate from the time she started working at the Stables. She stated that the "pole that was holding the gate was rotted," and that "[w]e were constantly having to put the gate back on the hinges." According to Cornett, she told Ron about the problem with the gate several times. The following exchange occurred:

Q. * * * But the day you were working there, you knew the gate you were concerned about was in place and that was the gate that was being used, correct?

A. Yes.

Q. So as I understand it, you were inside and you heard a noise. Can you describe what you heard?

A. The horses running. I didn't think anything about that.

Q. You recognized the sounds of horses running?

A. Yeah. And I didn't think anything about that. It was a pretty day. They had just been turned out not long ago. I thought they were playing and then I heard the sound of the metal - - that was bad - - so I went out to see what in the world was going on.

I ran down the aisle way, down the barn, ran out the door and that's the last thing I remember.

Q. Did you know if the gate was open before or after you got there?

A. I don't remember.

Q. Do you know if the horses hit you or the gate hit you?

A. I don't know.

Q. How long did you hear this metal, the sound that you could tell that they were at the gate?

A. Approximately two minutes maybe, if it took me that long to get down there.

Q. Was that concerning to you, hearing that noise?

A. Yes, it was.

Q. What was going through your mind?

A. That a horse was stuck in that gate.

Q. What was your worry about a horse getting stuck in a gate?

A. It's going to break its leg. It's going to do something bad to its leg.

Q. And that gate wasn't very strong, that could have been a problem?

A. That could've been a problem. I was more worried about the horse.

* * *

A. * * *

I woke up on the sidewalk and my shoes, you know, were way over there. I remember thinking why is my shoe way over there. I was completely out of it. I thought I was sweaty. It must have been blood. I'm getting tissues and just wiping thinking why am I sweating so bad. Shelby runs out and was like, oh, my God, what happened.

Q. Who's Shelby?

A. Shelby Pierson. The girl that owns Cowboy.

* * *

A. I told her - - I said I don't know, the horses kicked me or - - I don't even know what I told her really. I can't remember that far.

{¶ 28} Finally, when asked if there was "anything else about the condition of the premises that you think in any way contributed to this accident other than the gate," Cornett responded, "I think if the gate was strong enough, it would have held those horses back." She stated that " * * *[a]ny horse can be dangerous, even the friendliest. Any horse can have a mood. * * *."

{¶ 29} It is undisputed that Red Stone is an equine activity sponsor as the owner and operator of the Stables. R.C. 2305.321(A)(4). Regarding Cornett's assertion that

she was not an equine activity participant at the time of the accident, we note that in *Smith v. Landfair*, the Ohio Supreme Court considered the definition of spectator in R.C. 2305.321(A)(3)(g). Therein, Landfair was unloading his two horses from a trailer at the CJS Standardbred Stables in the presence of the stable owner and his daughter, Roshel Smith, who was there to visit her father. As the second horse was being unloaded, it was spooked by a passing Amish wagon and knocked Landfair to the ground. Smith approached to provide assistance and was kicked in the head by the horse. The Ohio Supreme Court determined as follows:

> The parties have offered us two competing interpretations. On the one hand, a spectator is merely a bystander who happens to be in the vicinity of an equine activity. On the other hand, a spectator is someone who purposely goes to a place where equine activities take place, intending to watch. In our view, the first is too broad and the second is too narrow.

> Being a mere bystander or passerby is not enough. First, the characteristics of the other types of "equine activity participants" listed in R.C. 2305.321(A)(3)(a) to (f) imply that a more active role was intended. All the other categories of participants describe riding, controlling, treating, and breeding the animals. These activities all involve purposeful, active contact with an equine, and to interpret "spectator" as extending to a bystander would inject disharmony among the subsections. Words in a statute must be read in context, R.C. 1.42, and we do not believe that the context in which the term "spectator" was placed permits such an incongruous reading.

Moreover, given the purpose of the statute, we conclude that a person must deliberately put himself or herself in a position of exposure to the "inherent risk" of proximity to horses before immunity can apply. The person need not be there to watch an equine activity in the classic sense of a spectator at a show or event. It is the purposeful placement in an area of exposure that draws the immunity. But the element of seeing cannot be completely eliminated, or the word "spectator" would be drained of all meaning. Thus, we hold that one who purposely places himself or herself in a location where equine activities are occurring and who sees such an activity is a "spectator" and hence an "equine activity participant" within the meaning of R.C. 2305.321(A)(3)(g).

Here, the facts encompass one of the situations envisioned by the legislature. Smith was injured due to an "inherent risk of equine activity," which includes the propensity of a horse to behave in ways that may result in injury. R.C. 2305.321(A)(7)(a). In other words, horses are unpredictable. Although Smith was not at the stable that day to work, she voluntarily placed herself in a location where equine activities were taking place, saw the attempted unloading of Annie from the trailer, and was injured due to the inherent risk of that activity. Her proximity to Landfair's horse was not due to chance. She was at a horse stable to see her father, the stable owner, and was standing near the place where an "equine activity," the unloading of a horse from a trailer, was occurring. R.C. 2305.321(A)(2)(a)(iv). Thus, Smith's personal-injury claim is barred.

We disagree with the Ninth District in this case. We reverse the judgment of the court of appeals on its holding that Smith was not a spectator as a matter of law because she was not watching Landfair unload Annie at the time she was injured. As we have said, intent to watch is not necessary to be a "spectator." As noted above, the statute at issue in this case is broadly written to address the inherent risks that arise when horses are near people, and it is the injured person's voluntary placement in a position of known exposure to that risk that is key. Merely glancing at a horse would not render someone a spectator of equine activity. Simply being in the vicinity of equine activities is not enough. Rather, the person must be there voluntarily, aware that equine activities are occurring.

*Id.*, ¶ 25-29.

{¶ 30} We conclude that Cornett, like Smith, voluntarily placed herself in the vicinity of the horses based upon her suspicion that one of them may have been injured by the gate. Furthermore, in actively attempting to secure the horses' safety, Cornett sought to restore control of them, pursuant to R.C. 2305.321(A)(3)(a). In other words, we find that Cornett was an equine activity participant.

{¶ 31} We further disagree with Cornett's assertion that she was not engaged in an equine activity at the time of the accident. Pursuant to R.C. 2305.321(A)(2)(a)(iii), Cornett was engaged in the boarding and daily care of the horses, including her own horses, when she was injured. We cannot agree with Cornett that her equine activity ended since she had completed her "chores" and was preparing to go home. When she heard the noise from the area of the gate, her first concern was for the well-being of the

horses for whom she was responsible, and she ran toward them to ascertain their safety. She testified that she is aware of the unpredictable nature of horses, that horses typically run to the barn if frightened, and that "any horse can be dangerous." In other words, there was an inherent risk of injury in the equine activity of caring for the horses, and Cornett's injuries resulted from that risk.

{¶ 32} Having determined that Cornett was an equine activity participant engaged in an equine activity, we further conclude that Red Stone did not forfeit immunity based upon the defective gate. Pursuant to R.C. 2305.321(B)(2)(a), immunity is forfeited if an equine activity sponsor provides to an equine activity participant "faulty or defective equipment or tack and knows or should know that the equipment or tack is faulty or defective * * *." Cornett testified that the defective gate was present (and in bad condition) when she began boarding and caring for the horses in 2008, and we cannot conclude that Red Stone provided the gate to Cornett as equipment or tack within the meaning of the statute. Further, it appears from Cornett's testimony that the problem was not with the gate itself but with the fence post to which it was hinged. Cornett stated that the post was "rotted," and that the gate had to be repeatedly re-hinged to the post. While the meaning of "tack" in the statute indisputably encompasses such things as saddles and bridles, we conclude that "equipment," defined as "the articles or implements used for a specific purpose or activity," includes such things as, for example, riding helmets, and does not encompass gates or fence posts. In other words, "equipment," as used in the statute, does not include conditions relative to the premises of the Stables, such as an allegedly defective enclosure, and Red Stone is accordingly entitled to immunity as an equine activity sponsor.

**{¶ 33}** Having construed the evidence in a light most favorable to Cornett, and having determined, in the absence of any genuine issue of material fact, that Cornett was an equine activity participant engaged in an equine activity at the time of her injury, such that her claims against Red Stone are barred, Cornett's assigned error is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Sean Brinkman
Aaron G. Durden
Edward J. Dowd
Joshua R. Schierloh
John P. Archer
Hon. Mary Katherine Huffman